UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                         :
                                              :          Chapter 11 Case Nos.
KASPER A.S.L., LTD., et al.,                  :          02-10497 (ALG)
                                              :
                          Debtors.            :          (Jointly Administered)

-------------------------------------------------------------x

## DEBTORS' THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

Dated:  New York, New York
        October 10, 2003

# TABLE OF CONTENTS

**Page**

Article I        DEFINITIONS AND CONSTRUCTION OF TERMS ................................................... 2

1.1      Administrative Expense Claim ................................................................................. 2

1.2      Affiliate .................................................................................................................. 2

1.3      Affiliate Claim ....................................................................................................... 2

1.4      Allowed .................................................................................................................. 2

1.5      Amended Bylaws .................................................................................................... 2

1.6      Amended Certificates of Incorporation ................................................................... 2

1.7      Assumed Corporate Indemnities ............................................................................ 2

1.8      Assumed Indemnification Claims ........................................................................... 3

1.9      Assumed Liabilities ................................................................................................ 3

1.10    Ballot ..................................................................................................................... 3

1.11    Bankruptcy Code .................................................................................................... 3

1.12    Bankruptcy Court ................................................................................................... 4

1.13    Bankruptcy Rules ................................................................................................... 4

1.14    Banks ..................................................................................................................... 4

1.15    Board of Advisors................................................................................................... 4

1.16    Business Day........................................................................................................... 4

1.17    Buyer ..................................................................................................................... 4

1.18    Cash ....................................................................................................................... 4

1.19    Causes of Action .................................................................................................... 4

1.20    Claim...................................................................................................................... 4

1.21    Class....................................................................................................................... 4

1.23    Collateral................................................................................................................ 4

1.24    Confirmation Date .................................................................................................. 4

1.25    Confirmation Hearing ............................................................................................. 5

1.26    Confirmation Order ................................................................................................ 5

1.27    Creditors' Committee.............................................................................................. 5

1.28    Debtor Affiliate Claim ........................................................................................... 5

1.29    Debtor Guarantors .................................................................................................. 5

1.30    Debtors ................................................................................................................... 5

1.31    Debtors in Possession ............................................................................................. 5

**TABLE OF CONTENTS**
**(continued)**

1.32    Disbursing Agent...................................................................................................5

1.33    Disclosure Statement ..............................................................................................5

1.34    Disputed Claim ........................................................................................................5

1.35    Disputed Claim Amount...........................................................................................5

1.36    Distribution Membership Interests...........................................................................6

1.37    Effective Date ..........................................................................................................6

1.38    ERISA ......................................................................................................................6

1.39    Entity .......................................................................................................................6

1.40    Equity Interest .........................................................................................................6

1.41    Estate Representative ...............................................................................................6

1.42    Estates .....................................................................................................................6

1.43    Excluded Liabilities .................................................................................................6

1.44    Federal Judgment Rate ............................................................................................7

1.45    Final Order...............................................................................................................7

1.47    General Unsecured Claim .........................................................................................7

1.48    Insured Claim ..........................................................................................................7

1.49    Kasper .....................................................................................................................7

1.50    Kasper Equity Interest.............................................................................................7

1.51    Lien ..........................................................................................................................7

1.52    New Common Stock..................................................................................................7

1.53    Non-Debtor Affiliates ..............................................................................................7

1.54    Non-Debtor Affiliate Claim......................................................................................8

1.56    Person.......................................................................................................................8

1.57    Petition Date ...........................................................................................................8

1.58    Plan..........................................................................................................................8

1.59    Plan Supplement......................................................................................................8

1.60    Post-Petition Banks.................................................................................................8

1.61    Priority Non-Tax Claim ...........................................................................................8

1.62    Priority Tax Claim ...................................................................................................8

1.63    Purchase Agreement ................................................................................................8

1.64    Purchase Price..........................................................................................................8

| | | |
|---|---|---|
| 1.65 | Record Date | 8 |
| 1.66 | Releasees | 8 |
| 1.67 | Reorganization Cases | 9 |
| 1.68 | Reorganized Debtors | 9 |
| 1.69 | Reorganized Kasper | 9 |
| 1.70 | Reorganized Subsidiaries | 9 |
| 1.71 | Replacement Post-Petition Bank Credit Agreement | 9 |
| 1.72 | Schedules | 9 |
| 1.73 | Secured Claim | 9 |
| 1.74 | Senior Notes | 9 |
| 1.75 | Senior Notes Claims | 9 |
| 1.76 | Senior Notes Indenture | 9 |
| 1.77 | Senior Notes Trustee | 9 |
| 1.78 | Senior Notes Trustee Claim | 9 |
| 1.79 | Subsidiary | 10 |
| 1.80 | Subsidiary Debtors | 10 |
| 1.81 | Subsidiary Equity Interest | 10 |
| 1.82 | Successor LLC | 10 |
| 1.83 | Tort Claims | 10 |
| 1.84 | Voting Deadline | 10 |
| Article II | TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS | 11 |
| 2.1 | Administrative Expense Claims | 11 |
| 2.2 | Professional Compensation and Reimbursement Claims | 11 |
| 2.3 | Priority Tax Claims | 12 |
| Article III | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS | 12 |
| Article IV | TREATMENT OF CLAIMS AND EQUITY INTERESTS | 12 |
| 4.1 | Priority Non-Tax Claims (Class 1) | 12 |
| 4.2 | Secured Claims (Class 2) | 12 |
| 4.3 | Senior Notes Claims and General Unsecured Claims (Class 3) | 13 |
| 4.4 | Affiliate Claims (Class 4) | 13 |
| 4.5 | Kasper Equity Interests (Class 5) | 13 |

| | | |
|---|---|---|
| 4.6 | Subsidiary Equity Interests (Class 6) | 13 |
| Article V | MEANS FOR IMPLEMENTATION | 14 |
| 5.1 | Purchase Agreement | 14 |
| 5.2 | Transactions Contemplated by the Purchase Agreement and the Plan | 14 |
| 5.3 | Successor LLC and the Estate Representative | 15 |
| 5.4 | Deemed Consolidation of the Debtors for Plan Purposes Only | 15 |
| 5.5 | Board of Directors | 16 |
| 5.6 | Authorization of Plan Securities | 16 |
| 5.7 | Cancellation of Existing Securities and Agreements | 16 |
| Article VI | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 16 |
| 6.1 | Conditions Precedent to Confirmation | 16 |
| 6.2 | Conditions Precedent to Effectiveness | 17 |
| 6.3 | Effect of Failure of Conditions | 17 |
| 6.4 | Waiver of Conditions | 17 |
| Article VII | EFFECT OF CONFIRMATION OF PLAN | 18 |
| 7.1 | Term of Bankruptcy Injunction or Stays | 18 |
| 7.2 | Revesting of Assets | 18 |
| 7.3 | Claims Extinguished | 18 |
| 7.4 | Discharge of Debtors | 18 |
| 7.5 | Injunction | 18 |
| Article VIII | DISTRIBUTIONS | 19 |
| 8.2 | Record Date for Distributions | 19 |
| 8.3 | Date of Distributions | 19 |
| 8.4 | Distributions Withheld for Disputed Claims | 19 |
| 8.5 | Exclusion of Tort Claims | 20 |
| 8.6 | Disbursing Agent | 20 |
| 8.7 | Rights and Powers of Disbursing Agent | 20 |
| 8.8 | Setoffs | 20 |
| 8.9 | Surrender of Instruments | 21 |
| 8.10 | Delivery of Distributions | 21 |
| 8.11 | Manner of Payment Under the Plan | 21 |

8.13    Distributions After the Effective Date ....................................................................21

Article IX        PROCEDURES FOR TREATING DISPUTED CLAIMS .........................................22

9.1      Objections to Claims ..............................................................................................22

9.2      No Distributions Pending Allowance .....................................................................22

9.3      Estimation of Claims ..............................................................................................22

Article X         EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................................22

10.1     Assumption or Rejection of Executory Contracts and Unexpired Leases ....................22

Article XI        RETENTION OF JURISDICTION.........................................................................24

11.1     Retention of Jurisdiction ........................................................................................24

Article XII        MISCELLANEOUS PROVISIONS.......................................................................25

12.1     Effectuating Documents and Further Transactions ................................................25

12.2     Corporate Action ....................................................................................................25

12.3     Exemption from Transfer Taxes .............................................................................26

12.4     Releases of Releasees..............................................................................................26

12.5     Limited Release by Releasees.................................................................................26

12.6     Exculpation .............................................................................................................27

12.7     Certain Indenture Trustee Fees and Expenses .......................................................27

12.8     Post-Effective Date Fees and Expenses.................................................................27

12.9     Payment of Statutory Fees......................................................................................27

12.10    Amendment or Modification of the Plan................................................................27

12.11    Severability .............................................................................................................28

12.12    Revocation or Withdrawal of the Plan....................................................................28

12.13    Binding Effect.........................................................................................................28

12.14    Notices ....................................................................................................................28

12.15    Governing Law........................................................................................................30

12.16    Withholding and Reporting Requirements .............................................................30

12.17    Plan Supplement......................................................................................................30

12.18    Sections 1125 and 1126 of the Bankruptcy Code ..................................................30

12.19    Cramdown ...............................................................................................................30

12.20    Allocation of Plan Distributions ............................................................................30

12.21    Exhibits/Schedules..................................................................................................31

**TABLE OF CONTENTS**
**(continued)**

**Page**

12.22    Authorization of the Estate Representative to Bind Successor LLC............................31

12.23    Filing of Additional Documents...............................................................................32

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| KASPER A.S.L., LTD., | :    02-10497 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| A.S.L. RETAIL OUTLETS, INC., | :    02-10500 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| ASL/K LICENSING CORP., | :    02-10502 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| AKC ACQUISITION, LTD., | :    02-10503 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| LION LICENSING, LTD., | :    02-10504 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 Case No. |
| KASPER HOLDINGS, INC., | :    02-10505 (ALG) |
| | : |
|      Debtor. | : |

-------------------------------------------------------------------x

## DEBTORS' THIRD AMENDED AND RESTATED JOINT PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Kasper A.S.L., Ltd.; A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; and Kasper Holdings, Inc., propose the following joint chapter 11 plan of reorganization, pursuant to section 1121(a) of title 11 of the United States Code:

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions. The following terms used in the Plan shall have the respective meanings defined below:

1.1 Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Reorganization Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Reorganization Cases, including without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

1.2 Affiliate has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.3 Affiliate Claim means any Debtor Affiliate Claim and Non-Debtor Affiliate Claim.

1.4 Allowed means, with reference to any Claim: (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) any Claim as to which no objection to allowance has been interposed in accordance with Section 9.1 or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder; (c) any Claim as to which the liability of the Debtors and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (d) any Claim expressly allowed hereunder.

1.5 Amended Bylaws means each of the amended and restated Bylaws of the Reorganized Debtors, which shall be in substantially the form contained in the Plan Supplement and shall be reasonably satisfactory to the Buyer.

1.6 Amended Certificates of Incorporation means each of the amended and restated Certificates of Incorporation of the Reorganized Debtors, which shall be in substantially the form contained in the Plan Supplement and shall be reasonably satisfactory to the Buyer.

1.7 Assumed Corporate Indemnities means any obligation of the Debtors pursuant to the Debtors' certificates of incorporation or bylaws, applicable state law or specific agreement, or any combination of the foregoing, to defend, indemnify, reimburse and limit the liability of any of their present or former officers, directors and/or employees who served as officers, directors or employees, respectively, on or after the Petition Date, solely in their capacity as officers, directors and/or employees of the Debtors, against any claims or obligations. On the Effective Date, the Debtors shall assign to Successor LLC, and Successor LLC shall assume from the Debtors, the Assumed Corporate Indemnities; *provided*, that on the Effective Date, Successor LLC shall obtain, or cause to be obtained, directors and officers insurance in amounts, and for periods, previously determined by the Debtors' Boards of Directors to cover such Assumed Corporate Indemnities.

1.8    Assumed Indemnification Claims means all Claims, if any, as to which the claimant asserts rights based only upon the Assumed Corporate Indemnities.  All Assumed Indemnification Claims asserted after the Effective Date shall be limited to an aggregate amount not to exceed the insurance coverage obtained by Successor LLC with respect to the Assumed Corporate Indemnities.

1.9    Assumed Liabilities means:

(a)  Except for the Excluded Liabilities, ordinary course of business liabilities of Kasper and the Subsidiaries, including those reflected within the determination of Net Working Capital (as defined in the Purchase Agreement), excluding liabilities for any material breach or violation of any Law (as defined in the Purchase Agreement) or any liabilities related to tortious conduct by Kasper, any Subsidiary or any employees of Kasper or any Subsidiary;

(b)  Except for the Excluded Liabilities, ordinary course of business obligations under the Contracts (as defined in the Purchase Agreement) of Kasper and the Subsidiaries, other than the Excluded Contracts (as defined in the Purchase Agreement);

(c)  Liabilities for Kasper's (i) documentary letters of credit related to goods ordered or to be ordered and outstanding at Closing (including any amendments required) and (ii) standby letters of credit outstanding at Closing;

(d)  Non-cash liabilities consisting of deferred income, including the current portion of deferred income;

(e)  Subject to Section 2.08 of the Purchase Agreement and the proviso set forth in Section 2.06(a) of the Purchase Agreement, and except as set forth in Sections 2.07(a) and (c) of the Purchase Agreement, any and all obligations and liabilities (contingent or otherwise) arising from, or relating to, the employment or services, or termination of employment or services, of any individual with respect to Kasper and its Subsidiaries, including without limitation (i) the Employee Plans (as defined in the Purchase Agreement) and any trusts, insurance contracts or other agreements relating thereto, except as set forth in Section 2.07(f) of the Purchase Agreement, (ii) the Employee Agreements (as defined in the Purchase Agreement), except as listed on Schedule 2.07 of the Purchase Agreement as an Excluded Contract, (iii) accrued and unpaid vacation, sick days and personal days, (iv) workers' compensation benefits (whether accrued before, on or after the Closing), (v) obligations under section 4980B of the Tax Code and Part 6 of Subtitle B of Title I of ERISA with respect to the current or former employees of Kasper and the Subsidiaries and their qualified beneficiaries, (vi) any obligations to employees terminated on or before the Closing Date (as defined in the Purchase Agreement) under the Worker Adjustment Retraining and Notification Act or similar state law by reason of the number of employees terminated after the Closing Date, and (vii) any liability (contingent or otherwise) under Title IV of Employee Retirement Income Security Act of 1974 with respect to any Multiemployer Plan to which Kasper or any of the Subsidiaries contributes or is required to contribute; and

(f)  The Tax (as defined in the Purchase Agreement) liabilities of Kasper, other than Excluded Taxes (as defined in the Purchase Agreement).

1.10    Ballot means the form distributed to holders of impaired Claims on which such holders indicate acceptance or rejection of the Plan and any election for, among other things, treatment of such impaired Claim provided under the Plan.

1.11    Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.12    Bankruptcy Court means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Reorganization Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, by the United States District Bankruptcy Court for the Southern District of New York.

1.13    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.14    Banks means, collectively, the agents and lenders that are or have been from time to time parties to that certain Credit Agreement (the "Pre-Petition Credit Agreement"), dated as of July 9, 1999, as amended, among Kasper, the Debtor Guarantors, certain non-Debtor guarantors, JPMorgan Chase Bank, as administrative agent, The CIT Group/Commercial Services, Inc., as collateral monitor and the lenders party thereto, and any and all of the documents, instruments and agreements relating thereto, including without limitation, all guarantees and security documents, instruments and agreements executed and delivered in connection with the Pre-Petition Credit Agreement, as same may have been amended, supplemented, modified, extended, replaced, refinanced, renewed or restated as of the Petition Date.

1.15    Board of Advisors means the three-member board that will advise the Estate Representative with respect to Successor LLC.

1.16    Business Day means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.17    Buyer means Jones Apparel Group, Inc., a Pennsylvania corporation, as buyer under the Purchase Agreement, and/or, if the context is appropriate, any assignee of Buyer permitted by Section 12.04(i) of the Purchase Agreement.

1.18    Cash means legal tender of the United States of America.

1.19    Causes of Action means, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Reorganization Cases, including through the Effective Date.

1.20    Claim has the meaning set forth in section 101 of the Bankruptcy Code.

1.21    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.22    Class 3 Interest Determination has the meaning set forth in Section 4.3 hereof.

1.23    Closing means the closing and consummation of the Purchase Agreement in accordance with its terms.

1.24    Collateral means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.25    Committees means the Creditors' Committee and the Equity Committee.

1.26     Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.27     Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.28     Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.29     Creditors' Committee means the official committee of unsecured creditors appointed in the Reorganization Cases, as constituted from time to time.

1.30     Debtor Affiliate Claim means any Claim, whether secured or unsecured, of a Debtor against another Debtor.

1.31     Debtor Guarantors means, collectively, A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; and Kasper Holdings, Inc.

1.32     Debtors means, collectively, Kasper; A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; and Kasper Holdings, Inc.

1.33     Debtors in Possession means the Debtors in their capacity as debtors in possession in the Reorganization Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.34     Disbursing Agent means any entity in its capacity as a disbursing agent under Section 8.6 hereof.

1.35     Disclosure Statement means the Third Amended and Restated Disclosure Statement relating to the Plan, including without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.36     Disputed Claim means any Claim which has not been Allowed pursuant to the Plan or a Final Order, *and*

(a) if no proof of claim has been filed by the applicable deadline:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors, Reorganized Debtors, Successor LLC or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; *or*

(b) if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or Successor LLC which has not been withdrawn or determined by a Final Order, or (v) any Tort Claim.

1.37     Disputed Claim Amount means the amount set forth in the proof of claim relating to a Disputed Claim or, if an amount is estimated in respect of a Disputed Claim in accordance with section 502(c) of the Bankruptcy Code, Bankruptcy Rule 3018 or other applicable law, the amount so estimated pursuant to a Final Order of the Bankruptcy Court.

1.38     Distribution Membership Interests means the Class 3(A) Membership Interests, the Class 3(B) Membership Interests and the Class 5 Membership Interests.

1.39     Effective Date means the first Business Day on which (a) the conditions specified in Section 6.2 of the Plan have been satisfied or waived; and (b) no stay of the Confirmation Order is in effect.

1.40     ERISA shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.41     Entity shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

1.42     Equity Committee means the official committee of holders of Equity Interests appointed in the Reorganization Cases, as constituted from time to time.

1.43     Equity Interest means any share of common stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

1.44     Estate Representative means the disinterested individual to be nominated by the Creditors' Committee and appointed by the Bankruptcy Court, who shall be the sole managing member of Successor LLC and shall be entitled to act in the name of, and on behalf of, Successor LLC with respect to all matters relating to the Plan and the Purchase Agreement on and after the Effective Date.

1.45     Estates shall have the meaning set forth in the Purchase Agreement.

1.46     Excluded Liabilities means any liabilities of Kasper and any Subsidiary relating to the period prior to the Closing Date other than Assumed Liabilities. Excluded Liabilities includes by way of example and not limitation, all obligations of Kasper and the Subsidiaries arising out of, relating to or otherwise in respect of:

(a) The pre-petition Claims and liabilities of Kasper and the Subsidiaries (for purposes of clarity, including amounts necessary to cure outstanding defaults and payable in connection with any executory Contract), other than any liability (contingent or otherwise) under Title IV of ERISA with respect to any Multiemployer Plan to which Kasper or any Subsidiary contributes or is required to contribute;

(b) The Replacement Post-Petition Bank Credit Agreement (except for cash borrowings thereunder and as provided in Section 2.06(c) of the Purchase Agreement);

(c) The Excluded Taxes;

(d) The Contracts listed on Schedule 2.07 of the Purchase Agreement;

(e) The fees and expenses payable to the financial and legal advisors, consultants and other professionals of the Debtors, the Reorganized Debtors, the Estate Representative, Successor LLC and the Committees, including but not limited to, fees and expenses of Peter J. Solomon Company Limited, Weil, Gotshal & Manges LLP, and Anderson, Kill & Olick, P.C.;

(f)   Any equity-based plan or compensation program related to the Kasper Equity Interests or other securities of Kasper, including without limitation the Kasper A.S.L., Ltd. 1997 Management Stock Option Plan and Kasper A.S.L., Ltd. 1999 Share Incentive Plan; and

(g)   The Break-Up Fee (as that term is defined in the Bid Procedures Order entered by the Bankruptcy Court on June 27, 2003 (the "Break-Up Fee")).

1.47    Federal Judgment Rate means the rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System and identified at http://www.federal reserve.gov/ releases/h15/current/.

1.48    Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or Successor LLC, as applicable , or, in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; *provided,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.49    First Post-Petition Bank Credit Agreement means that certain Credit Agreement, dated as of February 5, 2002, among Kasper, as borrower, the Debtor Guarantors and certain Non-Debtor Affiliates, as guarantors, and JPMorgan Chase Bank, as administrative agent, J.P. Morgan Securities Inc., as book manager and lead arranger, The CIT Group/Commercial Services, Inc., as collateral monitor, and the lenders party thereto, and any and all of the documents, instruments and agreements relating thereto, including without limitation, all guarantees and security documents, instruments and agreements executed and delivered in connection with the First Post-Petition Bank Credit Agreement, as the same may have been amended, restated, supplemented or otherwise modified from time to time.

1.50    General Unsecured Claim means a general unsecured Claim which is a Claim other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Claim or Affiliate Claim.

1.51    Insured Claim means any Claim arising from an incident or occurrence that is covered under the Debtors' insurance policies.

1.52    Kasper means Kasper A.S.L., Ltd., a Delaware corporation.

1.53    Kasper Equity Interest means any share of stock or other instrument evidencing an ownership interest in Kasper, including but not limited to the Old Common Stock, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest, all of which will be discharged, cancelled and terminated on the Effective Date.

1.54    Lien has the meaning set forth in section 101 of the Bankruptcy Code.

1.55    New Common Stock means the shares of common stock, par value $0.01 per share, of Reorganized Kasper authorized and issued hereunder for the purposes specified in the Purchase Agreement and the Plan.

1.56    Non-Debtor Affiliates means, collectively, Kasper A.S.L. Europe, Ltd.; Asia Expert Limited; Tomwell Limited; Kasper Canada ULC; and Anne Klein ULC.

1.57    Non-Debtor Affiliate Claim means any Claim, whether secured or unsecured, of a Non-Debtor Affiliate against a Debtor.

1.58    Old Common Stock means the common stock, par value $0.01 per share, of Kasper outstanding on the Petition Date, which will be discharged, cancelled and terminated on the Effective Date.

1.59    Person shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.60    Petition Date means February 5, 2002, the date on which the Debtors commenced the Reorganization Cases.

1.61    Plan means this Third Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, including without limitation, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time, and those documents identified in the Plan Supplement.

1.62    Plan Supplement means the supplement to the Plan containing certain documents relevant to the implementation of the Plan or the treatment of Allowed Claims thereunder.

1.63    Post-Petition Banks means, collectively, the agents and lenders that are from time to time parties to the First Post-Petition Bank Credit Agreement and the Replacement Post-Petition Bank Credit Agreement.

1.64    Priority Non-Tax Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.65    Priority Tax Claim means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.66    Purchase Agreement means that certain Purchase Agreement, dated as of August 7, 2003, by and between Kasper and Buyer relating to, *inter alia*, the purchase and sale of New Common Stock and the assumption of the Assumed Liabilities, attached to the Plan as "Exhibit A."

1.67    Purchase Price means $204,000,000.00, which amount shall be: (a) subject to adjustment; and (b) payable, in each case upon the terms and subject to the conditions set forth in the Purchase Agreement.

1.68    Record Date means, for purposes of voting on the Plan, the date on which the order of the Bankruptcy Court approving the Disclosure Statement is entered on the docket of the Bankruptcy Court and, for purposes of receiving a distribution under the Plan, the Confirmation Date.

1.69    Releasees means all present and former officers and directors of the Debtors and the Reorganized Debtors who were directors and/or officers, respectively, on or after the Petition Date and their advisors, consultants and professionals, and any other Persons who serve or served as members of management of such entities on or after the Petition Date and their advisors, consultants and professionals, all present and former Banks and Post-Petition Banks, all present and former officers and directors and other Persons who serve or served as members of the management of any present or former Banks and Post-Petition Banks, all members of the ad hoc committee of holders of Senior Notes and

members of the Committees and their respective officers, partners, and directors, and all post-Petition Date advisors, consultants or professionals of or to the Debtors, the Reorganized Debtors, the Banks, the Post-Petition Banks and the Committees.

1.70     Reorganization Cases means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on February 5, 2002 in the United States Bankruptcy Court for the Southern District of New York and styled In re Kasper A.S.L., Ltd., et al., 02-10497 (ALG).

1.71     Reorganized Debtors means the Debtors, and any successor of any such debtors by merger, consolidation or otherwise, on and after the Effective Date.

1.72     Reorganized Kasper means Kasper and any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

1.73     Reorganized Subsidiaries means, collectively, A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; and Kasper Holdings, Inc., upon the Effective Date, and any successors thereto by merger, consolidation or otherwise, on and after the Effective Date.

1.74     Replacement Post-Petition Bank Credit Agreement means that certain Secured, Super-Priority Debtor In Possession Revolving Credit Agreement, dated as of January 9, 2003, among Kasper, as borrower, the Debtor Guarantors and certain Non-Debtor Affiliates, as guarantors, and Citicorp USA, Inc., as administrative agent, book manager and arranger, and the lenders and issuers party thereto, and any and all of the documents, instruments and agreements relating thereto, including without limitation, all guarantees and security documents, instruments and agreements executed and delivered in connection with the Replacement Post-Petition Bank Credit Agreement, as the same may have been amended, restated, supplemented or otherwise modified from time to time. The Replacement Post-Petition Bank Credit Agreement replaced the First Post-Petition Bank Credit Agreement.

1.75     Schedules means the schedule of assets and liabilities, the list of holders of Equity Interests and the statement of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto.

1.76     Secured Claim means any Claim, to the extent reflected in the Schedules or on a timely filed proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.77     Senior Notes means the notes issued pursuant to the Senior Notes Indenture.

1.78     Senior Notes Claims means any Claim of the Senior Note Trustee and holders of Senior Notes against the Debtors arising out of or related to the Senior Notes Indenture or the transaction, agreement or instruments upon which the Senior Notes are based.

1.79     Senior Notes Indenture means the Indenture, dated as of June 4, 1997, as supplemented on June 30, 1997 and June 16, 1999, between Kasper (f/k/a Sassco Fashions, Ltd.) as issuer, and The Bank of New York, as successor in interest to IBJ Schroder Bank & Trust Company, as trustee.

1.80     Senior Notes Trustee means The Bank of New York, as successor to IBJ Schroder Bank & Trust Company as indenture trustee, registrar and paying agent under the Senior Notes Indenture.

1.81    Senior Notes Trustee Claim means any Claim of the Senior Notes Trustee pursuant to the Senior Notes Indenture against the Debtors for the reasonable fees and expenses of the Senior Notes Trustee including without limitation, reasonable attorneys' fees and expenses, and indemnification.

1.82    Subsidiary has the meaning set forth in Section 1.01 of the Purchase Agreement.

1.83    Subsidiary Debtors means, collectively, A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; and Kasper Holdings, Inc.

1.84    Subsidiary Equity Interest means any share of stock or other instrument evidencing an ownership interest in A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; or Kasper Holdings, Inc., whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

1.85    Successor LLC means KLC Liquidation Company LLC, a Delaware limited liability company and successor-in-interest to the Debtors with respect to the Plan. The sole purpose of Successor LLC shall be to act as a fiduciary for all holders of Claims against, and Equity Interests in, the Debtors in connection with the implementation of the Plan. Successor LLC shall have the following classes of non-certificated, non-transferable membership interests which, on the Effective Date, shall be issued as follows:

(a)    The "Estate Representative Membership Interest" shall be issued to the Estate Representative;

(b)    The "Class 3(A) Membership Interests" shall be issued to the Senior Notes Trustee on behalf of the holders of Class 3(A) Claims;

(c)    The "Class 3(B) Membership Interests" shall be issued to the holders of Class 3(B) Claims; and

(d)    The "Class 5 Membership Interests" shall be issued holders of Old Common Stock.

The Estate Representative Membership Interest shall authorize its holder to (i) manage Successor LLC, (ii) enforce the rights, and perform the obligations, of Successor LLC under the Purchase Agreement, (iii) make distributions to holders of Distribution Membership Interests, and (iv) otherwise implement and effectuate the terms of the Plan on and after the Effective Date.

The Distribution Membership Interests shall authorize their holders to receive the respective distributions, if any, of the corresponding Classes of Claims and Equity Interests under the Plan and enforce their rights with respect to such distributions against Successor LLC. The Distribution Membership Interests may not be transferred by any holder thereof, except by operation of law. The operating agreement of Successor LLC will include such additional provisions as are necessary to ensure that Successor LLC will not be treated as a corporation or as a publicly traded partnership for federal income tax purposes.

1.86    Tort Claims means any Claim related to personal injury, property damage, products liability, wrongful death or other similar Claims against any of the Debtors.

1.87    Voting Deadline means the date set by the Bankruptcy Court by which the Ballots for acceptance or rejection of the Plan or elections for alternative treatment under the Plan must be received by the Debtors' voting agent.

Interpretation, Application of Definitions and Rules of Construction. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and

the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used in the Plan that is not defined in the Plan shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

ARTICLE II

TREATMENT OF ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1     Administrative Expense Claims.

On the Effective Date, except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, Successor LLC shall pay to each holder of an Allowed Administrative Expense Claim representing Excluded Liabilities, Cash in an amount equal to such Allowed Administrative Expense Claim; *provided,* that Allowed Administrative Expense Claims representing Assumed Liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. Certain obligations under the Replacement Post-Petition Bank Credit Agreement shall be deemed Allowed Administrative Expense Claims and shall be paid by Successor LLC in full in Cash on the Effective Date. In addition, the Break-Up Fee shall be paid by Successor LLC in full in Cash on the Effective Date.

All Persons seeking an award of compensation by the Bankruptcy Court for Allowed Administrative Expense Claims (other than Allowed Administrative Expense Claims representing: (a) liabilities for goods or services incurred in the ordinary course of business by the Debtors, as Debtors In Possession; (b) liabilities arising under loans or advances to the Debtors, as Debtors In Possession; (c) compensation claims of employees of any Debtor under contract; and (d) Claims by Persons seeking cure for executory contracts and unexpired leases assumed pursuant to the Plan or section 365 of the Bankruptcy Code) must file their proofs of claim with respect thereto at least ten (10) days prior to the first date set for the Confirmation Hearing.

The Buyer and the Reorganized Debtors shall have no liability or obligation to make any distribution or other payment to holders of Administrative Expense Claims that are Excluded Liabilities under the Purchase Agreement.

2.2     Professional Compensation and Reimbursement Claims.

All Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall: (a) on or before the Confirmation Date, furnish the Debtors with a written estimate of their fees for services to be rendered and expenses to be incurred through the period ending on the Confirmation Date; (b) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is sixty (60) days after the date of the Closing, or such other date as may be fixed by order of the Bankruptcy Court; and (c) if granted such an award by the Bankruptcy Court, be paid by Successor LLC in full in such amounts as are allowed by the Bankruptcy

Court (i) on the date of such allowance, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Professional Compensation or Reimbursement Claim and the Debtors or Successor LLC, as applicable. The Debtors and Successor LLC are authorized to pay compensation for services rendered and reimbursement of expenses incurred after the Petition Date in the ordinary course and without the need for Bankruptcy Court approval.

     2.3     Priority Tax Claims.

On the Effective Date, except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive from Successor LLC Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon thereafter as is practicable. The Buyer and the Reorganized Debtors shall have no liability or obligation to make any distribution or other payment to holders of Priority Tax Claims, other than taxes that are Assumed Liabilities. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by Successor LLC as such obligations become due.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against, and Equity Interests in, each of the Debtors and specifies which of those Classes are: (a) impaired or unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to have rejected the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No |
| Class 2 | Secured Claims | Unimpaired | No |
| Class 3(A) | Senior Notes Claims | Impaired | Yes |
| Class 3(B) | General Unsecured Claims | Impaired | Yes |
| Class 4 | Affiliate Claims | Unimpaired | No |
| Class 5 | Kasper Equity Interests | Impaired | Yes |
| Class 6 | Subsidiary Equity Interests | Unimpaired | No |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

     4.1     Priority Non-Tax Claims (Class 1).

Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on or as soon as is practicable after the Effective Date, Successor LLC shall pay to each holder of an Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim plus interest.

4.2     Secured Claims (Class 2).

Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on the Effective Date each Allowed Secured Claim shall be, at Successor LLC's option: (a) reinstated; (b) paid, by Successor LLC, Cash in an amount equal to such holder's Allowed Secured Claim plus post-petition interest at the applicable non-default contract rate, or if none, at the Federal Judgment Rate; (c) satisfied by Successor LLC's surrender of the Collateral securing such Allowed Secured Claim to such holder; (d) offset against, and to the extent of, Successor LLC's Claims (as successor-in-interest to the Debtors) against the holder of such Allowed Secured Claim; or (e) otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. Notwithstanding the foregoing, as to any Allowed Secured Claim that is secured by property owned or to be owned as of the Effective Date by the Reorganized Debtors, such Allowed Secured Claim shall be treated in accordance with clause (b) of this Section 4.2 unless the Buyer, in its sole discretion, consents to the treatment of such Allowed Secured Claim in accordance with any other clause of this Section 4.2.

4.3     Senior Notes Claims and General Unsecured Claims (Class 3).

Class 3 consists of all Class 3(A) Senior Notes Claims and all Class 3(B) General Unsecured Claims. Senior Notes Claims and General Unsecured Claims shall vote together as a single class on whether to accept or reject the Plan.

(a) *Class 3(A) – Senior Notes Claims*. The Senior Notes Claims shall be Allowed in an aggregate amount equal to the aggregate principal amount of the Senior Notes outstanding as of the Petition Date, *plus* (i) accrued and unpaid pre-Petition Date interest, including interest on unpaid interest, plus (ii) accrued and unpaid post-Petition Date interest, including interest on unpaid interest, in each of cases (i) and (ii) in such amounts, if any, and at such rates as shall be determined by Final Order of the Bankruptcy Court (the "Class 3(A) Interest Determination"). Except to the extent that a holder of an Allowed Senior Notes Claim agrees to a different treatment, on the Effective Date the Senior Notes Trustee shall receive from Successor LLC, on behalf of the holders of Allowed Senior Notes Claims, Class 3(A) Membership Interests entitling each holder of Allowed Senior Notes Claims to payment in full of its Allowed Senior Notes Claim plus interest, as determined by Final Order of the Bankruptcy Court.

(b) *Class 3(B) – General Unsecured Claims*. The General Unsecured Claims shall be Allowed in an aggregate amount equal to the aggregate amount of such General Unsecured Claims as of the Petition Date, *plus* such (i) accrued and unpaid pre-Petition Date interest and (ii) accrued and unpaid post-Petition Date interest, in each of cases (i) and (ii) in such amounts, and at such rates, as shall be determined by Final Order of the Bankruptcy Court (the "Class 3(B) Interest Determination" and collectively with the Class 3(A) Interest Determination, the "Class 3 Interest Determination"). Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, on the Effective Date each holder of an Allowed General Unsecured Claim shall receive Class 3(B) Membership Interests entitling such holder to payment in full of its Allowed General Unsecured Claim plus interest, as determined by Final Order of the Bankruptcy Court.

4.4     Affiliate Claims (Class 4).

The legal, equitable and contractual rights of the holders of Allowed Affiliate Claims are unaltered by the Plan, and such Affiliate Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.

4.5      Kasper Equity Interests (Class 5).

All of the Kasper Equity Interests will be discharged, cancelled and terminated on the Effective Date. Each holder of Old Common Stock shall receive Class 5 Membership Interests entitling such holder to its *pro rata* share of the balance of the Purchase Price remaining, if any, after the payment, or provision for payment, of all Allowed Claims under the Plan.

4.6      Subsidiary Equity Interests (Class 6).

The Subsidiary Debtors guaranteed all of the obligations of Kasper under the Pre-Petition Credit Agreement, the First Post-Petition Bank Credit Agreement and the Replacement Post-Petition Bank Credit Agreement and pledged all or substantially all of their respective assets as collateral for their joint and several obligations under such guarantees. That indebtedness has been paid in full with monies provided by Kasper. Accordingly, Reorganized Kasper shall retain ownership of all of the Subsidiary Equity Interests in each of the Reorganized Subsidiaries and such Subsidiary Equity Interests shall be unimpaired under the Plan. Subsidiary Equity Interests in non-Debtor Affiliates shall be transferred to, or at the direction of, the Buyer in accordance with the terms of the Purchase Agreement.

ARTICLE V

MEANS FOR IMPLEMENTATION

5.1      Purchase Agreement.

The Plan is based upon, and will implement, the Purchase Agreement attached hereto as <u>Exhibit A</u>, and all terms and provisions of the Purchase Agreement are incorporated herein by reference. In the event of any inconsistency between the Plan and the Purchase Agreement, the provisions of the Purchase Agreement shall govern.

On August 14, 2003, the Bankruptcy Court entered an order approving the sale of all of the shares of New Common Stock of Reorganized Kasper to the Buyer in accordance with the terms of the Purchase Agreement and a plan of reorganization like the Plan. The Confirmation Order shall provide all authorizations necessary or required under sections 363, 365, 1123 and 1129 of the Bankruptcy Code to consummate the purchase and sale of the New Common Stock to the Buyer, and all transactions contemplated in connection with the Purchase Agreement, on the terms and subject to the conditions set forth in the Purchase Agreement and the Plan.

5.2      Transactions Contemplated by the Purchase Agreement and the Plan.

Pursuant to the Purchase Agreement and the Plan:

(a) Prior to the Effective Date:

       (i)      Kasper shall create Successor LLC, and

       (ii)      The Estate Representative and the Board of Advisors shall be identified in the Plan Supplement.

(b) On the Effective Date:

       (i)      The Kasper Equity Interests (including without limitation, the Kasper A.S.L., Ltd. 1997 Management Stock Option Plan and the Kasper A.S.L., Ltd. 1999 Share Incentive Plan) will be cancelled, extinguished and terminated,

(ii)     The New Common Stock will be authorized by Reorganized Kasper,

(iii)    Reorganized Kasper will assign, and will cause the Subsidiaries and the Estates to assign, to Successor LLC, and Successor LLC will assume from Reorganized Kasper, the Subsidiaries and the Estates (A) all of the Debtors' and the Reorganized Debtors' rights and obligations with respect to holders of Claims and Equity Interests pursuant to the Plan (collectively, the "Creditors and Interest Holders"), (B) all of the Assumed Corporate Indemnities; *provided*, that Successor LLC shall obtain directors and officers insurance in amounts, and for periods, previously determined by the Debtors' Boards of Directors to cover such Assumed Corporate Indemnities, and (C) all of Reorganized Kasper's, the Subsidiaries' and the Estates' rights and obligations under the Purchase Agreement, including but not limited to, Reorganized Kasper's right to receive payment of the Purchase Price and Reorganized Kasper's, the Subsidiaries' and the Estates' obligations with respect to the Excluded Liabilities and other obligations to the Creditors and Interest Holders thereunder,

(iv)    Reorganized Kasper will assign the Estate Representative Membership Interest to the Estate Representative,

(v)     In consideration and exchange for the satisfaction, discharge and release of all of their Claims against, and the termination of all of their Equity Interests in, the Debtors, Reorganized Kasper will assign the Distribution Membership Interests to the Creditors and Interest Holders and the Senior Notes Trustee, as applicable, and

(vi)    At the direction of Reorganized Kasper, the Buyer will pay the Purchase Price to Successor LLC, for purposes of the Plan and for all tax purposes, as if the Buyer had paid such Purchase Price to Reorganized Kasper and Reorganized Kasper had paid such Purchase Price to Successor LLC. In consideration for such payment, the Buyer will acquire from Reorganized Kasper, the New Common Stock and Reorganized Kasper and the Subsidiaries will assume the Assumed Liabilities (which shall be the only Liabilities of Reorganized Kasper and the Subsidiaries) pursuant to the terms of the Purchase Agreement.

5.3     Successor LLC and the Estate Representative.

Successor LLC shall be owned by the holders of Allowed Claims and Allowed Equity Interests, as represented by their Distribution Membership Interests entitling them to receive Cash in exchange therefor. Successor LLC shall have all of the rights, power and authority granted to it pursuant to its operating agreement and applicable law, including but not limited to, the right, power and authority to resolve and settle any and all of its liabilities and obligations, and shall create appropriate reserves for disputed liabilities, Disputed Claims and other liabilities. Successor LLC shall be managed by the Estate Representative, who will be nominated by the Creditors' Committee and appointed by the Bankruptcy Court pursuant to the Confirmation Order. The Estate Representative shall act as a fiduciary for the holders of all Claims against, and Equity Interests in, the Debtors and shall confer with the Board of Advisors before taking any significant action. Any dispute between the Estate Representative and the Board of Advisors with respect to such significant action shall be submitted to the Bankruptcy Court for resolution. The initial Board of Advisors shall consist of: (a) a holder of Senior Notes Claims nominated by the Creditors' Committee (the "Senior Notes Claims Advisor"); (b) a holder of Senior Notes Claims who is also a holder of Kasper Equity Interests nominated by the Creditors' Committee; and (c) a holder of Kasper Equity Interests nominated by the Equity Committee; *provided*, that upon entry of a Final Order with respect to the Class 3 Interest Determination, the Senior Notes Claims Advisor shall resign from the Board of Advisors and shall be replaced by a holder of Kasper Equity Interests nominated by the Equity Committee.

All expenses of Successor LLC and the compensation and expenses of the Estate Representative and any professionals retained by Successor LLC shall be paid in Cash out of all funds available to, or

reserved for, such purposes by Successor LLC before distributions are made by Successor LLC, including but not limited to, distributions on account of any Distribution Membership Interests. The expenses of the Board of Advisors and the fees and expenses of professionals and other Persons retained by the Board of Advisors shall be deemed expenses of, and be paid by, Successor LLC.

       5.4      Deemed Consolidation of the Debtors for Plan Purposes Only.

       Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated for the following purposes under the Plan: (a) all guaranties by any Debtor of the obligations of any other Debtor and no co-obligation of one Debtor with the obligation of any other Debtor arising prior to the Petition Date shall be deemed eliminated so that any Claim against any Debtor and any guaranty or co-obligation thereof executed by any other Debtor and any joint and several liability of any Debtor with another Debtor shall be deemed to be one obligation of the deemed consolidated Debtors; and (b) each and every Claim filed or to be filed in the Reorganization Cases shall be deemed filed against the deemed consolidated estates of all Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors and their estates.

       Such deemed consolidation, however, shall not (other than for purposes related to determining distributions under the Plan and as set forth above in this Section) effect: (a) the legal and organizational structure of the Reorganized Debtors; (b) pre- and post-Petition Date guaranties, liens, and security interests that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (ii) pursuant to the Plan, or (iii) in connection with any financing entered into by the Reorganized Debtors on the Effective Date; and (c) distributions out of any insurance policies or proceeds of such policies.

       Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on the Claims being reinstated and/or rendered unimpaired, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

       5.5      Board of Directors.

       On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the Boards of Directors of the Reorganized Debtors.

       On the Effective Date, the initial Board of Directors of Reorganized Kasper shall be appointed by the Buyer. Those directors and officers of Reorganized Kasper, the Reorganized Subsidiaries and their non-Debtor Affiliates not continuing in office shall be deemed removed therefrom as of the Effective Date and their replacements shall be deemed appointed pursuant to the order confirming the Plan.

       5.6      Authorization of Plan Securities.

       Reorganized Kasper shall be authorized to issue 1,000 shares of New Common Stock, without the need for any further corporate action and pursuant to section 303 of the Delaware General Corporation Law. The shares of New Common Stock authorized in the Amended Certificate of Incorporation or otherwise may be used for the purposes stated therein.

       5.7      Cancellation of Existing Securities and Agreements.

       Except for purposes of evidencing a right to distributions under the Plan, on the Effective Date all the agreements and other documents evidencing the Claims and Equity Interests or rights of any holder of a Claim or Equity Interest against the Debtors, including options or warrants to purchase Equity Interests, or obligating the Debtors to issue, transfer, or sell Equity Interests in the Debtors, shall be terminated,

cancelled, and of no further force or effect; *provided,* that the Senior Notes Indenture shall continue in effect for the purposes of (a) allowing the Senior Notes Trustee to make any distributions on account of the Senior Notes pursuant to the Plan and to perform such other necessary administrative functions with respect thereto; (b) allowing the Senior Note Trustee to take action to resolve any dispute regarding the allowance of any portion of the Senior Notes Claims; and (c) permitting the Senior Notes Trustee to maintain and assert any rights or liens for reasonable fees, costs, and expenses under the Senior Notes Indenture.

ARTICLE VI

CONFIRMATION AND EFFECTIVENESS OF THE PLAN

6.1    Conditions Precedent to Confirmation.

The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 6.4 of the Plan:

(a)  All exhibits to the Plan, including those contained in the Plan Supplement, shall be in form and substance reasonably acceptable to the Buyer and the Committees;

(b)  No default or event of default under the Replacement Post-Petition Bank Credit Agreement shall have occurred and be continuing; and

(c)  No default or event of default under the Purchase Agreement shall have occurred and be continuing.

6.2    Conditions Precedent to Effectiveness.

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 6.4 of the Plan:

(a)  The Confirmation Order, in form and substance reasonably acceptable to the Buyer and the Committees, shall have been entered by the Bankruptcy Court on or before December 1, 2003, and shall have become a Final Order.

(b)  The Effective Date shall have occurred on or before October 31, 2003, unless extended as provided by the Purchase Agreement;

(c)  All actions, documents, instruments, and agreements necessary to implement and effectuate the Plan and the Purchase Agreement shall have been taken or executed and delivered, as the case may be;

(d)  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtors to be necessary to implement and effectuate the Plan and the Purchase Agreement;

(e)  Each of the Amended Certificates of Incorporation and the Amended Bylaws, in form and substance reasonably acceptable to the Buyer, the Debtors and the Committees, shall have been filed, effected, or executed, as required; and

(f)  Each of the conditions to Closing under the Purchase Agreement shall have been satisfied or waived in accordance with the provisions thereof.

6.3     Effect of Failure of Conditions.

In the event that one or more of the conditions specified in Section 6.2 of the Plan have not occurred on or before the date that is ninety (90) days after the Confirmation Date: (a) the Confirmation Order shall be vacated; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

6.4     Waiver of Conditions.

The Debtors may waive, with the consent of the Buyer and the Committees, by a writing signed by an authorized representative of the Debtors and subsequently filed with the Bankruptcy Court, one or more of the conditions precedent set forth in Sections 6.1 and 6.2 of the Plan (other than the conditions set forth in Sections 6.1(b), 6.2(a) (except as to timing).

ARTICLE VII

EFFECT OF CONFIRMATION OF PLAN

7.1     Term of Bankruptcy Injunction or Stays.

Unless otherwise provided, all injunctions or stays provided for in the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

7.2     Revesting of Assets.

(a)     On the Effective Date, except as otherwise provided for in the Plan, the property of the estates of the Debtors shall revest in the respective Reorganized Debtors free of, and from, all Liens and Claims.

(b)     From and after the Effective Date, the Reorganized Debtors shall continue to operate their businesses, and shall use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code.

(c)     As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Liens, Claims, and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

7.3     Claims Extinguished.

As of the Effective Date, any and all avoidance claims or Causes of Action accruing to the Debtors, the Debtors in Possession and their successors-in-interest under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code and not then pending, shall be extinguished.

7.4     Discharge of Debtors.

The rights and distributions afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for, and in complete satisfaction, discharge and release of, all

Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors and the Debtors in Possession, or any of their assets or properties. Except as otherwise provided in the Plan: (a) on the Effective Date, all such Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full; and (b) all Persons shall be precluded from asserting against the Reorganized Debtors, their successors, or their assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

7.5     Injunction.

Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors, are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Reorganized Debtors or Successor LLC with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors on account of any such Claim or Equity Interest; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind with respect to any claims and Causes of Action which are extinguished, dismissed or released pursuant to the Plan. Such injunction shall extend to successors of the Debtors, including without limitation, the Reorganized Debtors and Successor LLC and their respective properties and interests in property; *provided*, that nothing contained in this Section shall enjoin, bar or otherwise impair commencement of direct personal claims against any Person other than the Debtors, the Reorganized Debtors or Successor LLC or the enforcement of the rights of holders of Allowed Claims receiving distributions under the Plan, including but not limited to, pursuant to the Distribution Membership Interests, against Successor LLC with respect to such rights to receive distributions.

7.6     Dissolution of Committees.

On and after the Effective Date, the Committees and their respective professionals shall terminate all activities and shall perform no function other than with respect to the resolution of the Class 3 Interest Determination. Upon entry of a Final Order determining the Class 3 Interest Determination, the Committees shall be dissolved and shall have no further responsibilities with respect to the Reorganization Cases.

ARTICLE VIII

DISTRIBUTIONS

8.1     Successor LLC shall make all distributions to the holders of Distribution Membership Interests in accordance with the terms of the Plan; *provided*, that Successor LLC is authorized to establish sufficient reserves to pay all of its obligations, including but not limited to with respect to the Excluded Liabilities.

8.2     Record Date for Distributions.

On the Record Date, the various transfer registers for each Class of Claims or Equity Interests as maintained by the Debtors or their respective agents, including registers for the Senior Notes, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or

Interests. The Debtors and the Senior Notes Trustee shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Record Date.

### 8.3 Date of Distributions.

Unless otherwise provided in the Plan, distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable (the "Initial Distribution Date"). The shares of New Common Stock shall be issued to the Buyer on the Effective Date.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.4 Distributions Withheld for Disputed Claims.

(a) *Holdback for Disputed Claims*. On the Initial Distribution Date and each subsequent date upon which a distribution is made under the Plan (each, a "Subsequent Distribution Date"), Successor LLC shall withhold from distributions to be made on such dates, Cash equal to one hundred percent (100%) of the distributions to which holders of Disputed Claims would be entitled under the Plan as of such dates if such Disputed Claims were Allowed Claims (collectively, the "Holdback Amount"). Holders of Disputed Claims that become Allowed Claims shall be entitled to any interest or other accretions actually earned in respect of the Holdback Amount related to a Disputed Claim that becomes an Allowed Claim.

(b) *Distributions Upon Allowance of Disputed Claims*. The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive distributions of Cash from Successor LLC on the next Subsequent Distribution Date that follows the quarter during which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order; *provided*, that the aggregate amount of such distributions shall not exceed the Holdback Amount plus interest actually earned thereon. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim prior to the Effective Date.

(c) *Surplus Distributions to Holders of Allowed Claims*. To the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the Holdback Amount over the amount of Cash actually distributed on account of such Disputed Claim, less any amounts to pay for the expenses of Successor LLC, shall constitute surplus available for distributions to holders of Allowed Claims, and upon payment in full of all Allowed Claims, Allowed Equity Interests (the "Surplus Distributions"). The Surplus Distributions shall be distributed to the holders of Allowed Claims and/or Allowed Equity Interests pursuant to the Plan; *provided*, that Successor LLC shall not be under any obligation to make any Surplus Distributions of Cash on a Subsequent Distribution Date unless the amount of Cash to be distributed aggregates $250,000.00 or more, unless the distribution is the last distribution to be made under the Plan.

### 8.5 Exclusion of Tort Claims.

Successor LLC may exclude Tort Claims from any distribution under the Plan to the extent it determines, in the exercise of its discretion, that sufficient insurance is available to cover such Tort Claims.

8.6     Disbursing Agent.

All distributions under the Plan shall be made by Successor LLC as Disbursing Agent or such other entity as may be designated by Successor LLC as a Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Successor LLC, including the costs and expenses of procuring any such bond or surety for the Senior Notes Trustee on behalf of the holders of Senior Notes.

8.7     Rights and Powers of Disbursing Agent.

(a) *Powers of the Disbursing Agent.*  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b) *Expenses Incurred on or After the Effective Date*.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Successor LLC.

8.8     Setoffs.

Successor LLC may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against the holder of such Claim; *provided,* that in the event the Debtors seek to exercise such setoff rights against the holder of a Claim that is a debtor in a case under the Bankruptcy Code, the Debtors shall comply with the requirements of the Bankruptcy Code, including seeking relief from the automatic stay.

8.9     Surrender of Instruments.

As a condition to receiving any distribution under the Plan, each holder of a Senior Note or Kasper Equity Interest, to the extent applicable, must surrender such Senior Note to the Senior Notes Trustee or such Kasper Equity Interest to Successor LLC or its designee.  Any holder of a Senior Note or Kasper Equity Interest that fails to (a) surrender such instrument or certificate; or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the second anniversary of the Effective Date, shall be deemed to have forfeited all rights and claims and may not participate in any distribution under the Plan; *provided,* that beneficial holders of Senior Notes or Kasper Equity Interests that are not certificated may electronically surrender through Depository Trust Company and such electronic surrender shall be deemed sufficient.

8.10    Delivery of Distributions.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim except the holders of Allowed Senior Notes Claims shall be made at the address of such holders as set forth on the

Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, unless the Debtors have been notified in writing of a change of address, including without limitation, by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder. All distributions to any holder of an Allowed Senior Notes Claim shall be made to the Senior Notes Trustee, who will then make distributions to beneficial holders of Senior Notes at the addresses reflected in the records of the Senior Notes Trustee. In the event that any distribution to any holder is returned as undeliverable, including distributions to beneficial holders of Senior Notes, or in the event that a distribution can not be made due to the incompleteness of the addresses of any holders of Senior Notes as reflected in the records of the Senior Notes Trustee, the Disbursing Agent shall be advised of such fact and shall then use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of two years from the Effective Date. After such date, all unclaimed property or interest in property shall revert to Successor LLC, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

> 8.11      Manner of Payment Under the Plan .

At the option of Successor LLC, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

> 8.12      Minimum Distributions.

No payment of Cash less than ten dollars ($10.00) shall be made by Successor LLC to any holder of a Claim unless it is the final distribution or a request therefor is made in writing to Successor LLC.

> 8.13      Distributions After the Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on and as of the Effective Date.

ARTICLE IX

PROCEDURES FOR TREATING DISPUTED CLAIMS

> 9.1      Objections to Claims.

Except insofar as a Claim is allowed under the Plan, Successor LLC and any holder of an Allowed Claim or an Allowed Equity Interest shall be entitled to object to Claims after the Effective Date. Any objections to Claims shall be served and filed on or before the later of (a) one hundred and twenty (120) days after the Effective Date; or (b) such date as may be fixed by the Bankruptcy Court.

> 9.2      No Distributions Pending Allowance.

Notwithstanding any other provision hereof, if any portion of a Claim, other than with respect to the disputed portion of a Class 3 Claim for interest accrued thereon, is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of the disputed portion of such Claim unless such Disputed Claim becomes an Allowed Claim. Until such time, Successor LLC shall withhold from the property to be distributed on or after the Effective Date, the portion of such property allocable to such

Disputed Claim. The portion of Class 3 Claims relating to principal and undisputed pre-Petition Date interest shall be distributed on the Effective Date.

9.3    Estimation of Claims.

The Debtors (prior to the Effective Date) and Successor LLC (after the Effective Date) may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether the Debtors or Successor LLC previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Successor LLC, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

ARTICLE X

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1    Assumption or Rejection of Executory Contracts and Unexpired Leases.

(a) *Executory Contracts and Unexpired Leases*. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases between the Debtors and any Person or Entity shall be deemed assumed by the Reorganized Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, (ii) as to which a motion for the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) that is listed on Schedule 10.1(a)(x) (executory contracts) or Schedule 10.1(a)(y) (unexpired leases), which Schedules shall be included in the Plan Supplement; *provided*, that the Debtors reserve the right upon prior consent of the Buyer (which consent shall not be reasonably withheld or delayed), on or prior to the Confirmation Date, to amend Schedules 10.1(a)(x) and 10.1(a)(y) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected by the Reorganized Debtors as of the Effective Date; *provided, further*, that the Buyer may give, at least ten (10) days prior to the first date set for the Confirmation Hearing, written notice to the Debtors that one or more executory contracts or unexpired leases set forth in Schedule 3.11(a)(x) or 3.11(a)(y) to the Purchase Agreement should be rejected by the Debtors or their affiliates, as applicable, in which event the Debtors shall amend Schedules 3.11(a)(x) and 3.11(a)(y) to the Purchase Agreement and Schedules 10.1(a)(x) and 10.1(a)(y) to the Plan Supplement, as applicable, and the Purchase Price shall be increased by an amount equal to the Rejected Contract Claims (as defined in the Purchase Agreement). The Debtors shall provide notice of any amendments to Schedules 10.1(a)(x) or 10.1(a)(y) to the other parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedules 10.1(a)(x) and 10.1(a)(y) shall not constitute an admission by the Debtors or their successors-in-interest that such document is an executory contract or an unexpired lease or that the Debtors or their successors-in-interest have any liability thereunder.

(b) *Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness*.  Each executory contract and unexpired lease listed or to be listed on Schedules 10.1(a)(x) or 10.1(a)(y) that relates to the use or occupancy of real property shall include (i) modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 10.1(a)(x) or 10.1(a)(y) and (ii) executory contracts or unexpired leases appurtenant to the premises listed on Schedules 10.1(a)(x) or 10.1(a)(y), including without limitation, all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements previously have been assumed or assumed and assigned by the Debtors.

(c) *Insurance Policies*.  All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan.  On the Effective Date, the Reorganized Debtors shall assume all insurance policies and any agreements, documents and instruments relating to coverage of all Insured Claims and assign all of the Reorganized Debtors' rights thereunder to Successor LLC.  Successor LLC shall assign the rights to proceeds under such policies with respect to the Assumed Liabilities to the Reorganized Debtors and retain all other rights under such policies, including but not limited to with respect to Excluded Liabilities.  Notwithstanding the foregoing, distributions under the Plan to any holder of an Insured Claim shall be in accordance with the treatment provided under Article IV of the Plan; *provided*, that any distribution with respect to any and all Insured Claims shall be limited to the amount of proceeds payable under the insurance policies and any agreements, documents and instruments relating thereto.  Nothing contained in this Section 10.1(c) shall constitute or be deemed a waiver of any Causes of Action that the Debtors or their successors-in-interest may hold against any entity, including without limitation, the insurer under any of the Debtors' or their successors-in-interests policies of insurance.

(d) *Approval of Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases*.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 10.1(a) hereof, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired leases specified in Section 10.1(a) hereof through the date of entry of an order approving the assumption, assumption and assignment or rejection of such unexpired leases and (iii) the approval, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 10.1(a) hereof.

(e) *Cure of Defaults*.  Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Successor LLC shall cure all undisputed defaults under any executory contract or unexpired lease assumed by the Reorganized Debtors pursuant to Section 10.1(a) hereof, in accordance with section 365(b)(1) of the Bankruptcy Code.  All disputed defaults that are required to be cured shall be cured by Successor LLC either within thirty (30) days of the entry of a Final Order determining the amount, if any, of Successor LLC's liability with respect thereto, or as may otherwise be agreed to by the parties.

(f) *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.1 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, the Reorganized Debtors and Successor LLC, by no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such

executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order and (iii) notice of an amendment to Schedule 10.1(a)(x) or 10.1(a)(y). All such Claims not filed within such time will be forever barred from assertion against the Debtors and Successor LLC and their estates and the Reorganized Debtors and their property.

(g) *Assumed Indemnification Obligations*. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment of the Assumed Indemnification Claims by the Debtors to Successor LLC. Except as otherwise limited by the Plan, the Assumed Indemnification Claims shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

(h) *Compensation and Benefit Programs*. Except as provided in Section 10.1(a) of the Plan, and except for Excluded Liabilities, which shall be deemed assumed by Successor LLC, all savings, retirement, health care, severance, performance-based cash incentive, retention, employee welfare benefit, life insurance, disability and similar plans or agreements, all directors and officers liability and other insurance and all workers compensation programs are treated as executory contracts under the Plan and shall, on the Effective Date, be deemed assumed by the Reorganized Debtors in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

ARTICLE XI

RETENTION OF JURISDICTION

11.1    Retention of Jurisdiction. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Reorganization Cases, the Plan and the Purchase Agreement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of cure amounts and Claims resulting therefrom;

(b) To hear and determine any and all adversary proceedings, applications and contested matters;

(c) To hear and determine any objections to, or requests to estimate, any Administrative Expense Claims or Claims;

(d) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e) To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f) To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including without limitation, the Confirmation Order or in the Plan;

(g) To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)  To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan and the Purchase Agreement, including but not limited to Claims for indemnification thereunder;

(i)  To hear and determine disputes involving Successor LLC, including but not limited to, disputes with respect to or between the Estate Representative and/or the Advisory Board;

(j)  To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(k)  To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)  To hear any other matter not inconsistent with the Bankruptcy Code; and

(m) To enter a final decree closing the Reorganization Cases.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1  Effectuating Documents and Further Transactions.

The Debtors, the Reorganized Debtors and Successor LLC are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Purchase Agreement and any securities issued pursuant to the Plan.

### 12.2  Corporate Action.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of the Debtors or Reorganized Debtors, including without limitation, the Amended Bylaws, the Amended Certificates of Incorporation, the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors and the creation of Successor LLC pursuant to the Plan, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable laws of the states in which the Debtors, Reorganized Debtors and Successor LLC are formed, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their Amended Bylaws and Amended Certificates of Incorporation with the requisite Secretaries of State, to the extent required by the applicable laws of such states.  The Amended Bylaws and the Amended Certificates of Incorporation shall contain provisions necessary to (a) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation and bylaws as permitted by applicable law; and (b) effectuate the provisions of the Plan.

### 12.3  Exemption from Transfer Taxes.

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or issuance of debt or equity securities under the Plan (including without limitation, the New Common Stock), the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage

recording or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including without limitation, the sales, if any, by the Debtors of owned property or assets pursuant to section 363(b) of the Bankruptcy Code and the assumptions, assignments and sales, if any, by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

       12.4        **Releases of Releasees**.

As of the Effective Date, the Debtors and the Debtors in Possession shall be deemed to release all of the Releasees from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors or the Debtors in Possession, in any way relating to the Debtors, the Debtors in Possession, the Reorganization Cases, the Plan, negotiations concerning the Plan and the ownership, management and operation of the Debtors, except for any act or omission arising from fraud or willful misconduct of a Releasee; *provided,* that the foregoing shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer or employee to the Debtors or any reimbursement obligation of any former director, officer or employee with respect to a loan or advance made by the Debtors to such former director, officer or employee. Nothing in the Plan shall effect a release in favor of any person other than the Debtors with respect to any debt owed to the United States Government, any state, city or municipality for any liability of such person arising under: (a) the Internal Revenue Code, or any state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; or (c) the customs laws of the United States, nor shall the Debtors or any other Person be released by the Plan from any liability under the criminal laws of the United States, any state, city or municipality, or the securities laws of the United States.

       12.5        **Limited Release by Releasees**.

Except as otherwise provided under the Plan, as of the Effective Date, each of the Releasees, in any capacity, generally releases the Debtors, the Debtors in Possession, the Reorganized Debtors and Successor LLC, in each case in any capacity, from any and all Causes of Action held by, assertable on behalf of or derivative from such Releasee, in any way relating to the Debtors, Debtors in Possession, the Reorganized Debtors, Successor LLC, the Reorganization Cases, the Plan, negotiations regarding or concerning the Plan and the ownership, management and operation of the Debtors other than indemnity matters or claims for which insurance coverage exists and Claims for, or related to, compensation from the Debtors or the Reorganized Debtors to which any Releasee may be entitled.

       12.6        **Exculpation**.

None of the Debtors, the Reorganized Debtors, Successor LLC, the Estate Representative, the members of the Committees, the Senior Notes Trustee, the Banks, the Post-Petition Banks, the Buyer (other than with respect to any liability or obligation arising out of, or relating to, the Purchase Agreement) or the holders of Senior Notes or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Reorganization Cases, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation or the administration of the Plan, or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, Reorganized Debtors, Successor LLC, the Estate Representative, the Committees, the Senior Notes Trustee, the Banks, and the Post-Petition Banks, the Buyer and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their

duties and responsibilities under the Plan. Nothing in the Plan shall effect a release of any Person other than the Debtors and Successor LLC (as successor in interest of the Debtors) with respect to any debt owed to the United States Government, any state, city or municipality for any liability of such person arising under: (a) the Internal Revenue Code, or any state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; or (c) the customs laws of the United States, nor shall the Debtors or any other Person be released by the Plan from any liability under the criminal laws of the United States, any state, city or municipality, or the securities laws of the United States. In addition, except as otherwise provided herein, the Debtors' reorganization process and Plan in no way discharge, release, or relieve the Debtors, the Reorganized Debtors, any other members of the Debtors' or Reorganized Debtors' controlled groups (as defined in 29 U.S.C. § 1301(a)(14)) with respect to any obligations arising under ERISA.

### 12.7    Certain Indenture Trustee Fees and Expenses.

The Senior Notes Trustee Claim for reasonable fees and expenses through the Effective Date will be paid by Successor LLC pursuant to the Confirmation Order in Cash on the Effective Date, without the need for the Senior Notes Trustee to file an application for allowance with the Bankruptcy Court. Upon payment of the Senior Notes Trustee Claim through the Effective Date in full, the Senior Notes Trustee will be deemed to have released its lien and priority rights for its fees and expenses under the Senior Notes Indenture solely to the extent of such payment. Successor LLC shall pay the Senior Notes Trustee reasonable fees and expenses (including counsel's fees and expenses) incurred after the Effective Date in connection with making a distribution to holders of Senior Notes or the resolution of any dispute regarding the allowance of any portion of the Senior Notes Claims.

### 12.8    Post-Effective Date Fees and Expenses.

From and after the Effective Date, Successor LLC shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Successor LLC, including without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan. Any dispute with respect to such fees and expenses will be resolved by the Bankruptcy Court.

### 12.9    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 12.10    Amendment or Modification of the Plan.

Subject to the terms of the Purchase Agreement, alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date; *provided,* that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified by the Debtors at any time after the Confirmation Date; *provided,* that if such alteration, amendment or modification adversely affects the rights of the creditors or the Buyer, the Debtors shall obtain the prior consent of such adversely affected party or its representatives prior to making such alternation, amendment or modification (which consent shall not be unreasonably withheld or delayed); and *provided, further,* that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered,

amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

12.11    Severability.

In the event that the Bankruptcy Court determines that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

12.12    Revocation or Withdrawal of the Plan.

Subject to provisions of Section 5.04 of the Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall constitute or be deemed a waiver or release of any claims by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

12.13    Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests and their respective successors and assigns, including without limitation, the Reorganized Debtors and Successor LLC.

12.14    Notices.

All notices, requests and demands to or upon the Debtors or, on and after the Effective Date, the Reorganized Debtors or Successor LLC, to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered by messenger or required overnight courier service or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

*If to the Debtors*:

Kasper A.S.L., Ltd.
11 West 42nd Street
New York, New York  10030
Attn:  General Counsel
Telephone: (212) 626-6121
Facsimile:  (212) 626-6354

*with a copy to*:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Alan B. Miller, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*If to Successor LLC:*

KLC Liquidation Company LLC
[ADDRESS]

*with a copy to*:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Alan B. Miller, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*If to the Buyer or the Reorganized Debtors*:

Jones Apparel Group, Inc.
1411 Broadway
39th Floor
New York, New York  10018
Attn:  Ira M. Dansky, Esq.
             Executive Vice President and General Counsel
Telephone:  (212) 642-3860
Facsimile:  (212) 790-9988

*with a copy to*:

Kaye Scholer LLP
425 Park Avenue
New York, New York   10022
Attn:  Marc Rosenberg, Esq. and Lynn Toby Fisher, Esq.
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689

*If to the Creditors' Committee:*

Anderson Kill & Olick, PC
1251 Avenue of the Americas
New York, New York  10020
Attn:  Mark D. Silverschotz, Esq.
Telephone:  (212) 278-1000
Facsimile:  (212) 278-1733

*If to the Equity Committee:*

Bell Boyd & Lloyd LLC
70 W. Madison Street, Suite 3300
Chicago, Illinois  60602
Attn:  Carmen Lonstein, Esq.
Telephone:  (312) 807-4397
Facsimile:  (312) 827-7073

*and*

Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, New York  10020-1089
Attn:  Carole Neville, Esq.
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

12.15     Governing Law.

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

12.16     Withholding and Reporting Requirements.

In connection with the consummation of the Plan, the Debtors, the Reorganized Debtors and Successor LLC, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

12.17     Plan Supplement.

The Amended Certificates of Incorporation, the Amended Bylaws and Schedules 10.1(a)(x) and 10.1(a)(y) referred to in Section 10.1 of the Plan, among other things, shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court and posted on the Debtors' web site (http://www.kasperasl.com) at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtors in accordance with Section 12.14 of the Plan.

12.18     Sections 1125 and 1126 of the Bankruptcy Code.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation section 1125(a) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtors, the Banks, and the members of the Committees, the Buyer and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

12.19     Cramdown.

The Debtors request confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

12.20     Allocation of Plan Distributions.

All distributions in respect of Claims will be allocated first to the portion of such Claims representing interest (as determined for federal income tax purposes), second to the original principal amount of such Claims (as determined for federal income tax purposes), and any excess to the remaining portion of such Claims.

12.21     Exhibits/Schedules.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full in the Plan.

12.22     Authorization of the Estate Representative to Bind Successor LLC.

Pursuant to the operating agreement of Successor LLC and applicable law, the actions of the Estate Representative, as managing member of Successor LLC, shall bind Successor LLC and the Estate Representative is authorized to execute all agreements, documents and instruments in its capacity as managing member of Successor LLC.  Furthermore, the signature of the Estate Representative upon any agreement, document or instrument shall be conclusive evidence of Successor LLC's determination to enter into such agreement, document or instrument.

12.23    Filing of Additional Documents.

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Dated:  New York, New York
         October 10, 2003

KASPER A.S.L., LTD.
A.S.L. RETAIL OUTLETS, INC.
ASL/K LICENSING CORP.
AKC ACQUISITION, LTD.
LION LICENSING, LTD.
KASPER HOLDINGS, INC.

By:  _____
     John D. Idol
     Chief Executive Officer
     (Kasper A.S.L., Ltd.)

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attorneys for Debtors and
   Debtors in Possession

By:  _____
     Alan B. Miller (AM 2817)
     A Member of the Firm

**EXHIBIT A**

**Purchase Agreement**

**PURCHASE AGREEMENT**

dated as of

August 7, 2003

by and between

**Kasper A.S.L., Ltd.**

and

**Jones Apparel Group, Inc.**

relating to the purchase and sale

of

**New Common Stock**

of

**Kasper A.S.L., Ltd.**

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS......................................................................................2

     Section 1.01.      Certain Definitions ..........................................................2

     Section 1.02.      Other Definitional and Interpretive Matters..................8

ARTICLE 2        PURCHASE AND SALE ..................................................................9

     Section 2.01.      Purchase and Sale ...........................................................9

     Section 2.02.      Unadjusted Purchase Price..............................................9

     Section 2.03.      Adjustment of Purchase Price........................................10

     Section 2.04.      Closing..........................................................................12

     Section 2.05.      Stock Certificates ..........................................................12

     Section 2.06.      Assumed Liabilities .......................................................12

     Section 2.07.      Excluded Liabilities.......................................................13

     Section 2.08.      Employee Matters ..........................................................13

ARTICLE 3        REPRESENTATIONS AND WARRANTIES OF THE COMPANY........14

     Section 3.01.      Corporate Existence and Power .....................................14

     Section 3.02.      Corporate Authorization ...............................................14

     Section 3.03.      Consents and Authorizations .........................................15

     Section 3.04.      Noncontravention ..........................................................15

     Section 3.05.      Capitalization ................................................................15

     Section 3.06.      Valid Issuance of Securities ..........................................15

     Section 3.07.      Subsidiaries ...................................................................16

     Section 3.08.      Financial Statements......................................................16

     Section 3.09.      Conduct of Business; Absence of Certain Changes ......16

     Section 3.10.      No Undisclosed Material Liabilities..............................18

     Section 3.11.      Material Contracts.........................................................18

     Section 3.12.      Litigation ......................................................................19

     Section 3.13.      Compliance with Laws and Court Orders......................19

     Section 3.14.      Properties......................................................................20

     Section 3.15.      Intellectual Property .....................................................20

     Section 3.16.      Insurance Coverage ......................................................21

     Section 3.17.      Permits .........................................................................21

     Section 3.18.      Inventories....................................................................22

Section 3.19.    Finders' Fees ................................................................................ 22

Section 3.20.    Labor Matters ................................................................................ 22

Section 3.21.    Employee Benefit Plans ................................................................ 22

Section 3.22.    Environmental Matters .................................................................. 24

Section 3.23.    Agreed-to Working Capital ........................................................... 24

Section 3.24.    Accounts Receivables .................................................................... 24

Section 3.25.    Officers, Directors, Employees and Consultants .......................... 24

Section 3.26.    Books and Records ........................................................................ 25

Section 3.27.    Factories ........................................................................................ 25

Section 3.28.    Company SEC Documents ............................................................ 25

Section 3.29.    Leslie Fay Settlement .................................................................... 25

ARTICLE 4        REPRESENTATIONS AND WARRANTIES OF THE BUYER .............. 26

Section 4.01.    Corporate Existence and Power ..................................................... 26

Section 4.02.    Corporate Authorization ................................................................ 26

Section 4.03.    Consents and Authorizations ......................................................... 26

Section 4.04.    Noncontravention .......................................................................... 26

Section 4.05.    Financing ....................................................................................... 26

Section 4.06.    Purchase for Investment ................................................................ 26

Section 4.07.    Litigation ....................................................................................... 26

Section 4.08.    Scope of Representations and Warranties of the Company .......... 26

Section 4.09.    Brokers and Other Advisors .......................................................... 27

ARTICLE 5        COVENANTS OF THE COMPANY ..................................................... 27

Section 5.01.    Conduct of the Company ............................................................... 27

Section 5.02.    Access to Information .................................................................... 27

Section 5.03.    Notices of Certain Events .............................................................. 28

Section 5.04.    Disclosure Statement and Plan ..................................................... 28

ARTICLE 6        COVENANTS OF THE BUYER ........................................................... 29

Section 6.01.    Confidentiality .............................................................................. 29

Section 6.02.    Bankruptcy Court Approvals ........................................................ 30

ARTICLE 7        COVENANTS OF THE BUYER AND THE COMPANY ...................... 31

Section 7.01.    Conditions Precedent to Effectiveness of Agreement; Bid
                 Protection ...................................................................................... 31

Section 7.02.     Further Assurances .................................................................. 31

Section 7.03.     Certain Filings ......................................................................... 31

Section 7.04.     Public Announcements ............................................................. 32

Section 7.05.     Supplementation and Amendment of Schedules .......................... 32

Section 7.06.     Preservation of and Access to Books and Records; Cooperation ............................................................................. 32

Section 7.07.     Administrative Claim Bar Date ................................................. 33

ARTICLE 8     TAX MATTERS ...................................................................... 33

Section 8.01.     Representations and Warranties ................................................. 33

Section 8.02.     Preparation of Tax Returns; Payment of Taxes .......................... 34

Section 8.03.     Closing Covenants ................................................................... 36

Section 8.04.     Tax Controversy ...................................................................... 37

ARTICLE 9     CONDITIONS TO CLOSING .................................................. 37

Section 9.01.     Conditions to Obligations of the Parties .................................... 37

Section 9.02.     Conditions to Obligation of the Buyer ....................................... 38

Section 9.03.     Conditions to Obligation of the Company .................................. 39

ARTICLE 10     SURVIVAL AND INDEMNIFICATION ................................... 39

Section 10.01.     Survival ................................................................................... 39

Section 10.02.     Indemnification of Buyer .......................................................... 40

Section 10.03.     Indemnification of the Estate Representative .............................. 40

Section 10.04.     Limitations .............................................................................. 40

Section 10.05.     Notice of Claim ....................................................................... 40

Section 10.06.     Right to Contest Claims of Third Persons ................................... 41

Section 10.07.     Exclusive Remedy ................................................................... 41

ARTICLE 11     TERMINATION ...................................................................... 41

Section 11.01.     Grounds for Termination .......................................................... 41

Section 11.02.     Effect of Termination ............................................................... 42

Section 11.03.     Deposit ................................................................................... 42

ARTICLE 12     MISCELLANEOUS ................................................................. 42

Section 12.01.     Notices ................................................................................... 42

Section 12.02.     Amendments and Waivers ........................................................ 43

Section 12.03.     Expenses ................................................................................. 44

Section 12.04.    Successors and Assigns ................................................................ 44

Section 12.05.    Governing Law ........................................................................ 44

Section 12.06.    Retention of Bankruptcy Court Jurisdiction .................................. 44

Section 12.07.    WAIVER OF JURY TRIAL ........................................................ 44

Section 12.08.    Counterparts .......................................................................... 44

Section 12.09.    Entire Agreement; Third Party Beneficiaries .............................. 45

Section 12.10.    Buyer Elections ....................................................................... 45

Exhibit A          Form of Stipulation of Settlement of IRS Claim
Exhibit B          Capital Budget

Schedule 2.07          Excluded Contracts
Schedule 2.08(a)          Employee Plans
Schedule 3.03          Consents and Authorizations
Schedule 3.07(a)          Subsidiaries
Schedule 3.09          Conduct of Business; Absence of Certain Changes
Schedule 3.10(b)          Undisclosed Liabilities
Schedule 3.11(a)(x)          Contracts
Schedule 3.11(a)(y)          Executory Contracts Rejected by the Company
Schedule 3.12          Litigation
Schedule 3.14(a)          Properties
Schedule 3.14(c)          Permitted Liens
Schedule 3.15(a)          Intellectual Property
Schedule 3.15(b)          Specified Registrations
Schedule 3.15(c)          Intellectual Property Rights
Schedule 3.15(e)          Intellectual Property – Employee Work Product
Schedule 3.16          Insurance
Schedule 3.20(a)          Labor Matters
Schedule 3.20(b)          Collective Bargaining Agreements
Schedule 3.21(a)          Employee Benefit Plans and Employment Agreements
Schedule 3.21(d)          Multiemployer Plans
Schedule 3.23          Net Working Capital as of the Balance Sheet Date
Schedule 3.24(a)          Consolidated Accounts Receivables
Schedule 3.24(b)          Reconciliation of CIT Group Client Aged Accounts Receivable Summary
Schedule 3.24(c)          CIT Group Client Aged Accounts Receivable Summary
Schedule 3.25          Officers, Directors, Employees and Consultants
Schedule 3.27          Factories
Schedule 5.01          Permitted Conduct Outside Ordinary Course of Business between
                       Signing Date and Closing Date
Schedule 8.01          Exceptions to Tax Representations

# PURCHASE AGREEMENT

AGREEMENT dated as of August 7, 2003 between Jones Apparel Group, Inc., a Pennsylvania corporation (the "**Buyer**"), and Kasper A.S.L., Ltd., a Delaware corporation (the "**Company**").

## W I T N E S S E T H :

WHEREAS, on February 5, 2002 (the "**Petition Date**"), each of the Company and certain of the Company's U.S. Subsidiaries (each a "**Debtor**" and collectively the "**Debtors**") commenced a case (collectively, the "**Reorganization Cases**") under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are jointly administered under No. 02-10497 (ALG);

WHEREAS, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their respective businesses and manage their respective properties as debtors in possession, and are administering their respective estates, as defined in Section 541 of the Bankruptcy Code (the "**Estates**");

WHEREAS, the Board of Directors of each of the Debtors has determined that it is advisable and in the best interests of the Estates and the beneficiaries of such Estates to consummate, subject to confirmation of a Second Amended and Restated Joint Plan of Reorganization incorporating the transactions contemplated by this Agreement, consistent with the terms and conditions of this Agreement and in form and substance reasonably acceptable to the Buyer (the "**Plan**"), by the Bankruptcy Court and effectiveness of such Plan, the transactions contemplated by this Agreement, upon the terms and conditions provided for herein;

WHEREAS, pursuant to the Plan and upon consummation of the transactions contemplated thereby, (i) all of the Old Common Stock (and any rights to acquire Old Common Stock or other equity interests in the Company) shall be discharged, canceled, or otherwise terminated and (ii) the Company shall issue the New Common Stock, all of which shall be purchased by the Buyer pursuant to this Agreement;

WHEREAS, the Plan will provide for an adequate reserve for payment and satisfaction of all Excluded Liabilities;

WHEREAS, in furtherance thereof and pursuant to Section 5.04 hereof, the Company has agreed to, and to cause the other Debtors to (i) prepare and transmit the Disclosure Statement, once approved by the Bankruptcy Court, to holders of claims and equity interests in the Reorganization Cases, (ii) solicit acceptance of the Plan, and (iii) seek entry of an order of the Bankruptcy Court in form and substance reasonably acceptable to the Buyer confirming the Plan pursuant to Section 1129 of the Bankruptcy Code (the "**Confirmation Order**") (the date on which the Confirmation Order is entered is hereinafter referred to as the "**Confirmation Date**"); and

WHEREAS, the Company desires to issue and sell the Shares to the Buyer, and the Buyer desires to purchase the Shares from the Company, upon the terms and subject to the conditions hereafter set forth.

The parties hereto agree as follows:

# ARTICLE 1

## DEFINITIONS

Section 1.01. *Certain Definitions.* (a) The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person; *provided* that none of the Company nor any of the Subsidiaries shall be considered an Affiliate of the Buyer.

"**Agreed-to Working Capital**" means $51,259,000.

"**Balance Sheet**" means the audited consolidated balance sheet of the Company and the Subsidiaries as of the Balance Sheet Date.

"**Balance Sheet Date**" means December 28, 2002.

"**Bid Procedures Order**" means the Order approving bid procedures entered by the Bankruptcy Court on June 27, 2003.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**Buyer Material Adverse Effect**" means, with respect to the Buyer, a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement and to consummate the transactions contemplated hereby or on the condition (financial or otherwise), business, assets or results of operations of the Buyer and its subsidiaries, taken as a whole, other than the effects of changes relating to (a) changes or conditions affecting the industries in which the Buyer and its subsidiaries operate generally, (b) changes in economic, regulatory or political conditions generally; (c) any act(s) of war or terrorism; (d) any generally applicable change in GAAP or the interpretation thereof; or (e) any breach of this Agreement by the Company.

"**Closing Date**" means the date of the Closing.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" means (i) prior to the Effective Date, Kasper A.S.L., Ltd., a Delaware corporation, as debtor and debtor in possession and (ii) on and after the Effective Date, Kasper A.S.L., Ltd. (as reorganized pursuant to the Plan), a Delaware corporation, and, in each case, any successors thereto by merger, consolidation, or otherwise.

"**Company's U.S. Subsidiaries**" means, collectively, A.S.L. Retail Outlets, Inc.; ASL/K Licensing Corp.; AKC Acquisition, Ltd.; Lion Licensing, Ltd.; Kasper A.S.L. Europe, Ltd.; and Kasper Holdings, Inc.

"**Confidentiality Obligations**" shall mean any confidentiality obligations set forth herein or in any other agreement to which the parties hereto are parties or by which they are bound, including the Confidentiality Agreement.

"**Confidentiality Regulations**" shall mean Treasury Regulation Section 1.6011-4(b)(3) or any successor provision of the Treasury Regulations promulgated under Section 6011 of the Code.

"**Contract**" shall mean any agreement, contract, lease or license (whether written or oral).

"**Deposit**" means the sum of Five Million Dollars ($5,000,000) deposited by the Buyer with the Escrow Agent on or before the date of this Agreement pursuant to the terms of the Escrow Agreement, together with the proceeds of all investments and reinvestments thereof.

"**Effective Date**" means the business day, after the Confirmation Date, on which all of the conditions to the effectiveness of the Plan have been satisfied or waived.

"**Environmental Laws**" means any applicable federal, state, local or foreign law (including, without limitation, common law), treaty, judicial decision, regulation, rule, judgment, order, decree, injunction, permit or governmental restriction or requirement or any agreement with any governmental authority or other third party relating to the environment or the effect of the environment on human health and safety, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq., the Toxic Substances Control Act, 15 U.S.C. 2601, et seq., the Clean Air Act, 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, 33 U.S.C. 1251, et seq., the Safe Drinking Water Act, 42 U.S.C. 300f, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. 1802 et seq., and the Emergency Planning and Community Right to Know Act, 42 U.S.C. 11001 et seq. and all rules and regulations promulgated pursuant thereto or published thereunder.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means Weil, Gotshal & Manges LLP, as Escrow Agent under the Escrow Agreement.

"**Escrow Agreement**" means the Escrow and Deposit Agreement, dated as of July 31, 2003, by and among the Company, the Buyer and the Escrow Agent.

"**Estate Representative**" means the Person designated as such under the Plan. After the Closing, the Estate Representative shall be entitled to act in the name of and on behalf of the Estates with respect to all matters relating to this Agreement and the transactions contemplated hereunder.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" means all Taxes of the Company or its Subsidiaries for a Pre-Closing Tax Period, including any liability of the Company or its Subsidiaries for Taxes of others (for example, by reason of transferee liability or application of Treas. Reg. section 1.1502-6) or any losses including damages, judgments, fines, costs, penalties, amounts paid in settlement and reasonable out-of-pocket costs and expenses payable with respect to Taxes claimed or assessed against the Company or its Subsidiaries if such Taxes or losses are attributable to the Pre-Closing Tax Period; provided, however, that notwithstanding anything contained herein to the contrary, Excluded Taxes shall not include (w) any Taxes in an amount reflected as an "accrued expense

and other" liability in the calculation of the Final Working Capital, (x) Taxes that arise as a result of an election by the Buyer as provided in Section 12.10 hereof; (y) Taxes that arise as a result of (i) the Buyer filing, or causing to be filed, an amended Tax Return on or after the Closing Date or (ii) an election (including, but not limited to, an election under Section 338 of the Code) made, or caused to be made, by the Buyer on or after the Closing Date, and (z) Taxes resulting from transactions or actions taken by the Company or any of its Subsidiaries after the Closing that are outside the ordinary course of business.

"**Final Order**" means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors, or, in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"**Form 10-K**" means the Form 10-K of the Company for the year ended December 28, 2002 filed with the Securities and Exchange Commission.

"**Form 10-Q**" means the Form 10-Q of the Company for the quarter ended March 29, 2003 filed with the Securities and Exchange Commission.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time.

"**Governmental or Regulatory Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any other country or any domestic or foreign state, county, city or other political subdivision.

"**Hazardous Materials**" means any material, substance or waste classified, characterized or regulated as "hazardous," "toxic," "pollutant," "contaminant," or words of similar meaning under any Environmental Laws, including, without limitation, petroleum and petroleum products, asbestos-containing materials, polychlorinated biphenyls, and urea formaldehyde foam insulation.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Intellectual Property Right**" means any United States or Canadian Trademark, trade name, application for trademark or service mark registration, patent, patent application, domain name, URL, trade secret, software, source codes, object codes, copyright, copyright registration, application for copyright registration or any other similar type of proprietary intellectual property right.

"**Interim Balance Sheet**" means the interim unaudited balance sheet of the Company and the Subsidiaries as of the Interim Balance Sheet Date.

"**Interim Balance Sheet Date**" means March 29, 2003.

"**IRS Stipulation**" means that certain Stipulation and Settlement of IRS Claim substantially in the form attached hereto as Exhibit A.

"**Knowledge of the Company**," "**Company's Knowledge**" or any other similar knowledge qualification in this Agreement means to the knowledge of John D. Idol, Joseph B. Parsons, Lee S. Sporn, Laura Lentini, Gregg Marks and Richard Owen.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset. For the purposes of this Agreement, a Person shall be deemed to own subject to a Lien any property or asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"**Material Adverse Effect**" means a material adverse effect on the ability of the Company to perform its obligations under this Agreement and to consummate the transactions contemplated hereby or on the condition (financial or otherwise), business, assets or results of operations of the Company and the Subsidiaries, taken as a whole, other than effects or changes relating to (a) changes or conditions generally affecting the women's apparel industry (except to the extent that any such change or condition has a material adverse effect on the Company that is materially greater than the adverse effect on comparable entities operating in such industry), (b) changes in economic, regulatory or political conditions generally; (c) any act(s) of war or terrorism; (d) any generally applicable change in GAAP or the interpretation thereof; or (e) any breach of this Agreement by the Buyer.

"**Multiemploye r Plan**" has the meaning specified in Section 3(37) of ERISA.

"**New Common Stock**" means the common stock, par value $0.01 per share, of the Company to be issued at the Closing.

"**Non-Debtor Affiliates**" means, collectively, Kasper A.S.L. Europe, Ltd.; Asia Expert Limited; Tomwell Limited; Kasper Canada ULC; and Anne Klein ULC.

"**Old Common Stock**" means the common stock, par value $0.01 per share, of the Company outstanding on the Petition Date which will be discharged, cancelled or otherwise terminated pursuant to the Plan and upon consummation of the transactions contemplated hereby.

"**Order**" means any writ, judgment, ruling, decree, injunction or similar order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Post-Petition Bank Credit Agreement**" means that certain Secured Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of January 30, 2003, among

the Company, as borrower, certain of the Company's U.S. Subsidiaries, as guarantors, and Citicorp USA, Inc., as administrative agent, arranger and book manager and the lenders and issuers party thereto, and any and all of the documents, instruments and agreements relating thereto, including, without limitation, all guarantees and security documents, instruments and agreements executed and delivered in connection with the Post-Petition Bank Credit Agreement, as the same may have been amended, restated, supplemented or otherwise modified from time to time.

"**Pre-Closing Tax Period**" means, with respect to the Company or its Subsidiaries, any Tax period (or portion thereof) ending on or before the Closing Date. For purposes of this Agreement, with respect to any taxable year or period of the Company or any of its Subsidiaries which includes the Closing Date (but does not end on that day), Excluded Taxes for the Pre-Closing Tax Period shall be computed as if such taxable year or period ended as of the close of business on the Closing Date; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period after the Closing Date in proportion to the number of days in each such period.

"**Reorganized Debtors**" means the Debtors, and any successor of any such debtors by merger, consolidation or otherwise, on and after the Effective Date.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shares**" means 100 shares of New Common Stock to be issued to the Buyer pursuant hereto, which, immediately following the Closing, shall be and constitute all of the duly issued and outstanding capital stock of the Company.

"**Straddle Period Return**" shall mean any Tax Return required to be filed by the Company or any Subsidiary relating to a taxable year or period beginning on or before and ending after the Closing Date.

"**Subsidiary**" means any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by the Company.

"**Tax**" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, estimated (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, *ad valorem*, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Taxing Authority, whether disputed or not, in each case whether such Tax arises by law, contract or otherwise and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Tax Returns**" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"**Trademark**" means any trademark, service mark or trade dress rights developed or acquired by the Company or any of its Subsidiaries (or their predecessors), through use or registration, in particular words, logos, stylized lettering, and other designs.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Accounting Referee | 2.03 |
| Action | 3.12 |
| Admin Bar Date | 7.07 |
| Administrative Claim Bar Date Order | 7.07 |
| Approval Hearing | 7.01 |
| Approval Order | 7.01 |
| Assumed Liabilities | 2.06 |
| Auction | 7.01 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Buyer | Preamble |
| Buyer Indemnified Losses | 10.02 |
| Buyer Indemnified Persons | 10.02 |
| Closing | 2.04 |
| Closing Statement | 2.03 |
| Closing Working Capital | 2.03 |
| Company | Preamble |
| Company SEC Documents | 3.28 |
| Company Securities | 3.05 |
| Confidentiality Agreement | 6.01 |
| Confirmation Date | Recitals |
| Confirmation Order | Recitals |
| Debtors | Recitals |
| Disclosure Statement | 5.04 |
| Employee Agreement | 3.21 |
| Employee Plan | 3.21 |
| Estates | Recitals |
| Estate Indemnified Losses | 10.03 |
| Estate Indemnified Persons | 10.03 |
| Excluded Contracts | 2.07 |
| Excluded Liabilities | 2.07 |
| Final Working Capital | 2.03 |
| Indemnified Losses | 10.02 |
| Indemnified Party | 10.05 |
| Indemnity Account | 2.02 |
| Indemnifying Party | 10.01 |
| Intellectual Property Contracts | 3.15 |
| Leases | 3.14 |
| Losses | 10.02 |
| Net Working Capital | 2.03 |

| Term | Section |
|---|---|
| Other Property | 3.14 |
| Pension Plan | 3.21 |
| Permits | 3.17 |
| Permitted Liens | 3.14 |
| Petition Date | Recitals |
| Plan | Recitals |
| Purchase Price | 2.02 |
| Rejected Contract Claim | 2.03 |
| Reorganization Cases | Recitals |
| SEC | 3.28 |
| Specified Registrations | 3.15 |
| Subsidiary Securities | 3.07 |
| Third Person | 10.06 |
| Third Person Claim | 10.06 |
| Unadjusted Purchase Price | 2.02 |
| Working Capital Adjustment Account | 2.02 |

Section 1.02.    *Other Definitional and Interpretive Matters.*

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are material to and an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule (i) shall be deemed to have been disclosed on each other schedule and (ii) is not an acknowledgement that such matter or item is material.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)        The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

ARTICLE 2

PURCHASE AND SALE

Section 2.01.        *Purchase and Sale*.  Upon the terms and subject to the conditions of this Agreement, the Company agrees to issue and sell to the Buyer, and the Buyer agrees to purchase from the Company at the Closing, the Shares.  The purchase price to be paid by the Buyer for the Shares shall be paid to the Estate Representative as provided in Sections 2.02 and 2.03.

Section 2.02.        *Unadjusted Purchase Price*.

(a)        At the Closing, the consideration to be paid by Buyer for the Shares shall be equal to Two Hundred and Four Million Dollars ($204,000,000) (the "**Unadjusted Purchase Price**"), subject to adjustment as provided in Section 2.03 (as adjusted, the "**Purchase Price**"). The Unadjusted Purchase Price shall be paid as follows:  (i) an amount equal to the Unadjusted Purchase Price *minus* the Deposit shall be paid by the Buyer and (ii) pursuant to the terms of the Escrow Agreement, in accordance with joint written instructions of the Buyer and the Company, an amount equal to the Deposit shall be paid by the Escrow Agent, in each case by wire transfer of immediately available funds to such account(s) as shall have been designated by the Estate Representative to the Buyer and the Escrow Agent in writing prior to the Closing.

(b)        Of the Unadjusted Purchase Price, the Estate Representative shall hold Ten Million Dollars ($10,000,000) in an interest bearing segregated account (the "**Working Capital Adjustment Account**") for purposes of any adjustment provided for in Section 2.03 and until such time as the Final Working Capital has been determined and any payment due to Buyer as a result of any adjustment provided for in Section 2.03 has been made.

(c)        Further, the Estate Representative shall hold Seven Million Dollars ($7,000,000) of the Unadjusted Purchase Price in an interest bearing segregated account (the "**Indemnity Account**") for a period of six months following the Closing for the purpose of satisfying claims by Buyer for Buyer Indemnified Losses, *provided*, that if there is then pending a claim by the Buyer for Buyer Indemnified Losses, the Estate Representative shall retain in the Indemnity Account, pending resolution of such claim, an amount equal to the amount so claimed by the Buyer (but in no event more than the amount then remaining in the Indemnity Account).

Section 2.03.     *Adjustment of Purchase Price.*

(a)     As promptly as practicable, but no later than forty-five (45) days after the Closing Date, the Buyer shall cause to be prepared and delivered to the Estate Representative the Closing Statement (as defined below) and a certificate based on such Closing Statement setting forth the Buyer's calculation of Closing Working Capital.  The closing statement (the "**Closing Statement**") shall fairly present in all material respects the consolidated Net Working Capital of the Company as of the end of business on the Closing Date ("**Closing Working Capital**").  "**Net Working Capital**" means, with respect to the Company and the Subsidiaries: (i) cash and restricted cash (for purposes of clarity, cash includes cash equivalents); plus, (ii) accounts receivable, net of appropriate reserves; plus, (iii) inventory (for purposes of clarity, for finished goods, net of reserves); plus, (iv) piece goods at contractor (for purposes of clarity, net of reserves); plus, (v) piece goods at AEL (for purposes of clarity, net of reserves); plus, (vi) prepaid and other current assets (for purposes of clarity, not including income tax refund, deferred tax asset, or any Federal or state income tax asset); less, (vii) accounts payable (for purposes of clarity, post-petition); less, (viii) accrued expenses and other (for purposes of clarity, not including (a) interest payable, (b) deferred income or current portion of deferred income, and (c) income tax payable, deferred tax liability, or any Federal or state income tax accrual); less, (ix) revolver (for purposes of clarity, under the Post-Petition Bank Credit Agreement, cash borrowings only, and whether or not the revolver is classified as a short term or long term liability), in each case as determined in accordance with GAAP (to the extent applicable) and the Company's historical internal reporting accounting practices, consistently applied between the Balance Sheet Date and the Closing Date, and as reflected as a line item on the Company's internal reporting balance sheets; *provided*ˌ that "Net Working Capital" shall exclude any insurance claim (or cash attributable to any insurance claim) for a loss arising after the Balance Sheet Date relating to assets reflected in the Balance Sheet that would not otherwise be included in Net Working Capital.

(b)     If the Estate Representative disagrees with the Buyer's calculation of Closing Working Capital delivered pursuant to Section 2.03(a), the Estate Representative may, within thirty (30) days after delivery of the Closing Statement, deliver a notice to the Buyer disagreeing with such calculation and setting forth the Estate Representative's calculation of such amount.  Any such notice of disagreement shall specify those items or amounts as to which the Estate Representative disagrees, and the Estate Representative shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of Closing Working Capital delivered pursuant to Section 2.03(a).

(c)     If a notice of disagreement shall be duly delivered pursuant to Section 2.03(b), the Buyer and the Estate Representative shall, during the fifteen (15) days following such delivery, use their best efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Closing Working Capital, which amount shall not be less than the amount thereof shown in the Buyer's calculation delivered pursuant to Section 2.03(a) nor more than the amount thereof shown in the Estate Representative's calculation delivered pursuant to Section 2.03(b).  If during such period, the Buyer and the Estate Representative are unable to reach such agreement, they shall promptly thereafter cause KPMG LLP (the "**Accounting Referee**") to review this Agreement and the disputed items or amounts for the purpose of calculating Closing Working Capital.  In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement and the Estate Representative calculation of Closing Working Capital as to which the Estate Representative has disagreed.  The Accounting Referee shall deliver to the Buyer and the Estate Representative, as promptly as practicable (but in any case no later than thirty (30) days from the date of

engagement of the Accounting Referee), a report setting forth such calculation. Such report shall be final and binding upon the Buyer and the Estates. The cost of such review and report shall be borne equally by the Buyer and the Estates.

(d)     The Buyer and the Estate Representative shall, and shall cause their respective representatives to, cooperate and assist in the preparation of the Closing Statement and the calculation of Closing Working Capital and in the conduct of the review referred to in this Section 2.03, including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.

(e)     If Final Working Capital exceeds the Agreed-to Working Capital, the Buyer shall pay to the Estate Representative, in the manner and with interest as provided in Section 2.03(f), the amount of such excess. If the Agreed-to Working Capital exceeds Final Working Capital, the Estate Representative shall pay to the Buyer as an adjustment to the Purchase Price, in the manner and with interest as provided in Section 2.03(f), the amount of such excess. Any payment made by the Estate Representative pursuant to this Section 2.03 shall be made solely from the Working Capital Adjustment Account under the Plan. The Working Capital Adjustment Account shall be the Buyer's sole source of recovery for any adjustment made pursuant to this Section 2.03. "**Final Working Capital**" means Closing Working Capital (i) as shown in the Buyer's calculation delivered pursuant to Section 2.03(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 2.03(b); or (ii) if such a notice of disagreement is delivered, (A) as agreed by Buyer and the Estate Representative pursuant to Section 2.03(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 2.03(c); provided, however, that in no event shall Final Working Capital be more than the Estate Representative's calculation of Closing Working Capital delivered pursuant to Section 2.03(b) or less than the Buyer's calculation of Closing Working Capital delivered pursuant to Section 2.03(a).

(f)     Any payment pursuant to Section 2.03 shall be made at a mutually convenient time and place within three Business Days after Final Working Capital has been determined by wire transfer by the Buyer or the Estate Representative, as the case may be, of immediately available funds to the account of such other party as may be designated in writing by such other party. The amount of any payment to be made pursuant to this Section 2.03 shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to the rate of interest announced by Bank of America, N.A. from time to time as its base rate in New York City in effect from time to time during the period from the Closing Date to the date of payment. Such interest shall be payable at the same time as the payments to which it relates and shall be calculated daily on the basis of a year of three hundred sixty five (365) days and the actual number of delays elapsed.

(g)     The Purchase Price shall be increased by an amount equal to the aggregate of the claims, determined as provided in Section 502 of the Bankruptcy Code, of the non-Debtor party to each executory Contract rejected at the request of the Buyer pursuant to Section 7.05(b) (each, a "**Rejected Contract Claim**"), *plus* the Debtors' reasonable costs and expenses incurred in connection with the procedure set forth in Section 7.05(b). Notwithstanding the provisions of Section 2.03(f), the Buyer shall pay the increase in Purchase Price, if any, required by this Section 2.03(g) at the Closing or, as to any Rejected Contract Claim whose amount has not been agreed to by the Company and the Buyer by the Closing, then within five Business Days after the amount of any Rejected Contract Claim is determined by agreement of the Company and the Buyer or by Order of the Bankruptcy Court.

Section 2.04. *Closing*. The closing (the "**Closing**") of the purchase and sale of the Shares hereunder shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, as soon as practicable after, but in no event later than five (5) business days after, satisfaction of the conditions set forth in Article 9 (other than those conditions which will be satisfied on the Closing Date), or at such other time or place as the Buyer and the Company may agree.

Section 2.05. *Stock Certificates*. At the Closing, the Company shall deliver to the Buyer a certificate for the Shares, duly registered in the name of the Buyer or such other name as the Buyer shall have requested, which request shall be made not later than two Business days prior to the Closing Date.

Section 2.06. *Assumed Liabilities*. The Plan shall provide that the only liabilities of the Company and the Subsidiaries relating to the period prior to the Closing Date that shall survive and remain liabilities of the Company and the Subsidiaries on and after the Closing Date shall be the following (the "**Assumed Liabilities**"):

(a) except as set forth in Section 2.07, ordinary course of business liabilities of the Company and the Subsidiaries including those reflected within the determination of Net Working Capital; provided, however, for purposes of this Agreement the term "ordinary course of business" shall not be deemed to include liabilities for any material breach or violation of any Law or any liabilities related to tortious conduct by the Company, any Subsidiary or any employees of the Company or any Subsidiary;

(b) except as set forth in Section 2.07(a), ordinary course of business obligations under the Contracts of the Company and the Subsidiaries other than the Excluded Contracts (for purposes of clarity, excluding any obligations under the Contracts that are listed on Schedule 3.11(a)(y) *other than* Rejected Contract Claims which are provided for in Section 2.03(g));

(c) liabilities for the Company's (i) documentary letters of credit related to goods ordered or to be ordered and outstanding at Closing (including any amendments required) and (ii) standby letters of credit outstanding at Closing;

(d) non-cash liabilities consisting of deferred income including the current portion of deferred income;

(e) subject to Section 2.08 and the proviso set forth in Section 2.06(a) and except as set forth in Sections 2.07(a) and (c), any and all obligations and liabilities (contingent or otherwise) arising from or relating to the employment or services, or termination of employment or services, of any individual with respect to the Company and the Subsidiaries, including without limitation (i) the Employee Plans and any trusts, insurance contracts or other agreements relating thereto, except as set forth in Section 2.07(f), (ii) the Employee Agreements, except as listed on Schedule 2.07 as an Excluded Contract, (iii) accrued and unpaid vacation, sick days and personal days, (iv) workers' compensation benefits (whether accrued before, on or after the Closing Date), (v) obligations under Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA with respect to the current or former employees of the Company and the Subsidiaries and their qualified beneficiaries, (vi) any obligations to employees terminated on or before the Closing Date under the Worker Adjustment Retraining and Notification Act or similar state law by reason of the number of employees terminated after the Closing Date and (vii) any liability (contingent

or otherwise) under Title IV of ERISA with respect to any Multiemployer Plan to which the Company or any Subsidiary contributes or is required to contribute; and

        (f)     the Tax liabilities of the Company other than Excluded Taxes.

        Section 2.07.    *Excluded Liabilities.*  Neither Buyer, the Company nor the Subsidiaries shall be liable following the Closing for any liabilities of the Company or any Subsidiary relating to the period prior to the Closing Date other than the Assumed Liabilities (the "**Excluded Liabilities**").  All of the Excluded Liabilities, pursuant to the Plan, shall be the responsibility of the Estate Representative.  The "**Excluded Liabilities**" shall include, by way of example and not limitation, all obligations or liabilities of the Company and the Subsidiaries arising out of, relating to or otherwise in respect of:

        (a)     the Pre-Petition claims and liabilities of the Company and the Subsidiaries (for purposes of clarity, including amounts necessary to cure outstanding defaults and payable in connection with any executory Contract) (other than any liability (contingent or otherwise) under Title IV of ERISA with respect to any Multiemployer Plan to which the Company or any Subsidiary contributes or is required to contribute);

        (b)     the Post-Petition Bank Credit Agreement (except for cash borrowings and as provided in Section 2.06(c));

        (c)     the Excluded Taxes;

        (d)     the Contracts listed on Schedule 2.07 (the "**Excluded Contracts**");

        (e)     the fees and expenses payable to the financial and legal advisors, consultants and other professionals of the Estates, the Company and the Official Committee of the Unsecured Creditors of the Estates including Peter J. Solomon Company Limited, Weil, Gotshal & Manges LLP, and Anderson, Kill & Olick, P.C.;

        (f)     any equity-based plan or compensation program related to Old Common Stock or other Company Securities including without limitation the Kasper A.S.L., Ltd. 1997 Management Stock Option Plan and Kasper A.S.L., Ltd. 1999 Share Incentive Plan; and

        (g)     the Break-Up Fee (as that term is defined in the Bid Procedures Order).

        Section 2.08.    *Employee Matters.*

        (a)     With respect to each non-represented employee of the Company or any Subsidiary who is not a party to an Employee Agreement set forth on Schedule 3.21(a), Buyer shall cause the Company and Subsidiaries, with respect to each such employee, (i) to continue the employment of such employee immediately after the Closing at the same salary or hourly wage rate and position in effect immediately prior to the Closing and (ii) for a period of one year, to cover such employee under employee benefit and compensation plans, programs and arrangements that are substantially similar in the aggregate to those maintained by the Company and its Subsidiaries in effect immediately prior to the Closing Date (other than the Kasper A.S.L., Ltd. 1997 Management Stock Option Plan, the Kasper A.S.L., Ltd. 1999 Share Incentive Plan and any other stock based plan) applicable to such employee; provided, Buyer agrees to cause the Company and Subsidiaries to maintain, and not amend, terminate or discontinue, the Employee Plans set forth on Schedule 2.08(a),  except to the extent required to comply with applicable laws.

Subject to applicable laws, (x) notwithstanding the above provisions of this Section 2.08(a), the Company and the Subsidiaries shall have the right to dismiss any or all employees who are not represented by a labor union (subject to any written employment agreements with the Company or any Subsidiary) at any time, with or without cause, and (y) subject to clause (ii) above, to change the terms and conditions of their employment (including compensation and employee benefits provided to them).

(b)      With respect to each employee of the Company or any Subsidiary who is a party to an Employee Agreement set forth on Schedule 3.21(a), except for the individuals with Excluded Contracts listed on Schedule 2.07, Buyer shall cause the Company and Subsidiaries to honor their obligations under the Employee Agreements.

(c)      Buyer agrees that, with respect to all of its employee benefit plans, programs and arrangements covering or otherwise benefiting any employee of the Company or any Subsidiary on or after the Closing, service with the Company and its Subsidiaries shall be recognized for purposes of eligibility to participate, vesting, and level of benefits, but excluding benefit accruals, to the same extent such service (including prior service with any predecessor of the Company or any Subsidiary) is recognized under the corresponding Employee Plans, provided that such recognition does not result in any duplication of benefits.

(d)      Pursuant to the Plan, the Company shall terminate all equity-based plans and compensation programs related to Old Common Stock or other Company Securities, including without limitation the Kasper A.S.L., Ltd. 1997 Management Stock Option Plan and Kasper A.S.L., Ltd. 1999 Share Incentive Plan.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Buyer as of the date hereof and as of the Closing Date (except as otherwise provided herein) that:

Section 3.01.      *Corporate Existence and Power.*  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and, subject to any necessary authority from the Bankruptcy Court, has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company has heretofore delivered or made available to the Buyer true and complete copies of the certificate of incorporation and bylaws of the Company, as currently in effect.

Section 3.02.      *Corporate Authorization.*  The execution, delivery and, upon entry of the Confirmation Order, the performance of this Agreement by the Company, and the consummation of the transactions contemplated hereby, are within the Company's corporate powers and have been duly authorized by all necessary corporate action on the part of the

Company.  Subject to the entry of the Confirmation Order, this Agreement constitutes a valid and binding agreement of the Company.

Section 3.03. *Consents and Authorizations*.  The execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby by the Company require no material action, consent or approval by or in respect of, or filing with, any Person or any Governmental or Regulatory Authority other than (i) compliance with any applicable requirements of the HSR Act; (ii) consents, approvals or actions of, or filings with or notice to, the Bankruptcy Court; and (iii) as provided on Schedule 3.03.

Section 3.04. *Noncontravention*.  The execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby by the Company do not and will not (i) violate the certificate of incorporation or bylaws of the Company or of any Subsidiary, as now in effect or as may be amended pursuant to the Plan, (ii) assuming compliance with the matters referred to in Section 3.03, violate any applicable law, rule, regulation or Order, except for any such violations which have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (iii) require any material consent or other material action by any Person under, constitute a material default under, or give rise to any material right of termination, cancellation or acceleration of any right or obligation of the Company or any Subsidiary or to a loss of any material benefit to which the Company or any Subsidiary is entitled under any provision of any material agreement or other material instrument binding upon the Company or any Subsidiary or (iv) result in the creation or imposition of any Lien on any asset of the Company or any Subsidiary, other than Permitted Liens.

Section 3.05. *Capitalization*.  (a) (i) As of the date hereof, the authorized capital stock of the Company consists of 20,000,000 shares of Old Common Stock and 1,000,000 shares of preferred stock.  As of the date hereof, there are outstanding 6,800,000 shares of Old Common Stock and no shares of preferred stock.

(ii)     As of the date hereof, all outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable.  Except as set forth in this Section 3.05(a) or as disclosed in the Form 10-K or Form 10-Q, as of the date hereof, there are no outstanding (A) shares of capital stock or voting securities of the Company, (B) securities of the Company convertible into or exchangeable for shares of capital stock or voting securities of the Company or (C) options or other rights to acquire from the Company, or other obligation of the Company to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the Company (the items in clauses 3.05(a)(ii)(A), 3.05(a)(ii)(B) and 3.05(a)(ii)(C) being referred to collectively as the "**Company Securities**").  There are no outstanding obligations of the Company or any Subsidiary to repurchase, redeem or otherwise acquire any the Company Securities.

(b)     Pursuant to the Plan, all of the outstanding Company Securities shall be canceled immediately prior to the Closing with no further rights and obligations relating thereto.  As of the Closing (and giving effect to the Closing), (A) the authorized capital stock of the Company will consist of 1,000 shares of New Common Stock and (B) there will be outstanding 100 shares of New Common Stock.  As of the Closing (and giving effect to the Closing), the Buyer will be the sole owner of the New Common Stock.

Section 3.06. *Valid Issuance of Securities*.  The Shares which are being issued to the Buyer hereunder will be duly and validly authorized and, when issued, sold and delivered

in accordance with the terms hereof and upon payment of the Purchase Price as provided herein, will be fully paid and non-assessable, free of preemptive rights and free and clear of all Liens.

Section 3.07. *Subsidiaries*. (a) Each Subsidiary is a corporation duly incorporated, validly exiting and in good standing under the laws of its jurisdiction of incorporation, and has, subject to any necessary authority from the Bankruptcy Court, all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted except for those licenses, authorizations, permits, consents and approvals the absence of which has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All Subsidiaries and their respective jurisdictions of incorporation are identified on Schedule 3.07(a). The Company has heretofore delivered or made available to the Buyer true and complete copies of the formation documents and bylaws of each Subsidiary as currently in effect.

(b) Except for Liens that will be released or discharged at or prior to Closing pursuant to the Plan or the Confirmation Order, all of the outstanding capital stock or other voting securities of each Subsidiary is, and on the Closing Date will be, owned by the Company, directly or indirectly, free and clear of any Lien and free of any other limitation or restriction on the right to vote, sell or otherwise dispose of such capital stock or other voting securities, and nothing in the Plan or Confirmation Order reduces, dilutes, restricts, or otherwise affects in any way the Company's direct or indirect ownership of, or interest in, each Subsidiary. There are no outstanding (i) securities of any Subsidiary convertible into or exchangeable for shares of capital stock or voting securities of any Subsidiary or (ii) options or other rights to acquire from any Subsidiary, or other obligation of any Subsidiary to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of any Subsidiary (the items in clauses 3.07(b)(i) and 3.07(b)(ii) being referred to collectively as the "**Subsidiary Securities**"). There are no outstanding obligations of any Subsidiary to repurchase, redeem or otherwise acquire any outstanding Subsidiary Securities.

Section 3.08. *Financial Statements*. Subject to the qualifications expressed in the opinion of the Company's auditors, dated March 17, 2003, the Balance Sheet and the related audited consolidated statement of income and cash flows for the year ended December 28, 2002 and the Interim Balance Sheet and the related unaudited interim consolidated statements of income and cash flows for such period fairly present in all material respects, in conformity with GAAP applied on a consistent basis (except as may be indicated in the notes thereto), the consolidated financial position of the Company and the Subsidiaries as of the dates thereof and their consolidated results of operations and cash flows for the periods then ended (subject to normal year-end adjustments and the absences of footnotes in the case of any unaudited interim financial statements).

Section 3.09. *Conduct of Business; Absence of Certain Changes*. Except as approved by the Bankruptcy Court or as set forth on Schedule 3.09, since the Balance Sheet Date, there has not been:

(a) any change, which would have a Material Adverse Effect, in (i) the business, financial condition, or operations of the Company or any Subsidiary, or (ii) the

condition of the assets and property, real and personal, tangible and intangible, of the Company or any Subsidiary;

(b)     any declaration, setting aside, or payment of any dividend or any distribution (in cash or in kind) to any shareholder of the Company or any Subsidiary with respect to any securities of the Company or any Subsidiary, or any direct or indirect redemption, purchase, or other acquisition by the Company of any Company Securities;

(c)     any increase in compensation or other remuneration payable to or for the benefit of or committed to be paid to or for the benefit of any shareholder, director, officer, agent, or employee of the Company or any Subsidiary, or in any benefits granted under any Employee Plan with or for the benefit of any such shareholder, director, officer, agent, or employee, other than in the ordinary course of business;

(d)     any transaction entered into or carried out by the Company or any Subsidiary other than in the ordinary course of business;

(e)     other than in the ordinary course of business, (i) any borrowing or incurrence of any other indebtedness, contingent or other, by or on behalf of the Company or any Subsidiary or (ii) any endorsement, assumption, or guarantee of payment or performance of any loan or obligation of any other Person by the Company or any Subsidiary;

(f)     any change made by the Company or any Subsidiary in its methods of doing business or of accounting;

(g)     any grant by the Company or any Subsidiary of any mortgage, security interest, or other encumbrance with respect to its property, other than Permitted Liens;

(h)     any sale, lease, or disposition of, or any agreement to sell, lease, or dispose of, any of its property other than arm's-length sales, leases, or dispositions in the ordinary course of business of the Company or any Subsidiary, other than Permitted Liens;

(i)     any material modification or termination of any material contract described on Schedule 3.11 or any material term thereof;

(j)     any purchase by the Company or any Subsidiary of capital assets other than in accordance with the capital budget attached hereto as Exhibit B, which budget is consistent with the overall budget of the Company for fiscal year 2003 that has been approved by the Board of Directors of the Company (it being understood that expenditures for particular line items in excess of the amounts budgeted therefor shall nonetheless be in accordance with the capital budget so long as the aggregate capital expenditures do not exceed the aggregate amount budgeted therefor);

(k)     other than in the ordinary cause of business and other than loans between the Company and the Subsidiaries, any loan or advance made by the Company or any Subsidiary to any Person; or

(l)     any binding commitment or agreement by the Company or any Subsidiary to do any of the foregoing items (a) through (k).

Section 3.10.    *No Undisclosed Material Liabilities.*  Other than in the ordinary course of business, there are no material liabilities of the Company or any Subsidiary of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than:

(a)    liabilities disclosed in the Form 10-K or Form 10-Q or provided for in the Balance Sheet or disclosed in the notes thereto or in the Interim Balance Sheet or disclosed in the notes thereto;

(b)    liabilities disclosed on Schedule 3.10(b); or

(c)    performance and payment obligations (but not liabilities for breach or violation) lawfully incurred under arm's length Contracts for goods or services.

Section 3.11.    *Material Contracts.*  (a) Except (x) as disclosed in Schedule 3.11(a)(x) and (y) for executory Contracts that have been or will be rejected by the Company or the Subsidiaries by Order of the Bankruptcy Court (as listed in Schedule 3.11(a)(y) or as specifically contemplated by the Plan) or will be rejected by the Company or the Subsidiaries with the written consent of the Buyer on or prior to the Effective Date, neither the Company nor any Subsidiary is a party to or bound by:

(i)    any lease (whether of real or personal property) providing for annual rentals of $125,000 or more;

(ii)    other than in the ordinary course of business, any agreement for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders for piece goods and finished goods in the ordinary course of business) providing for aggregate payments by the Company and the Subsidiaries of $125,000 or more;

(iii)    other than in the ordinary course of business, any sales, distribution or other similar agreement providing for the sale by the Company or any Subsidiary of materials, supplies, goods, services, equipment or other assets that provides for aggregate payments to the Company and the Subsidiaries of $125,000 or more;

(iv)    any partnership, joint venture or other similar agreement or arrangement;

(v)    any agreement relating to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise);

(vi)    any agreement relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset), except any such agreement with an aggregate outstanding principal amount not exceeding $100,000 and which may be prepaid on not more than 30 days notice without the payment of any penalty;

(vii)    any material option, license, franchise or similar material agreement;

(viii)    any material agency, dealer, sales representative, marketing or other similar agreement;

(ix)    any agreement that limits the freedom of the Company or any Subsidiary to compete in any line of business or with any Person or in any area or which would so limit the freedom of the Company or any Subsidiary after the Closing Date; or

(x)    any other agreement not made in the ordinary course of business consistent with past practices that is material to the Company and the Subsidiaries, taken as a whole, or to any of the Company, Lion Licensing, Ltd., A.S.L. Retail Outlets, Inc. or Kasper Partnership, G.P., taken individually.

(b)    Except for any executory Contracts that may be rejected by the Company or the Subsidiaries with the written consent of the Buyer, each Contract disclosed in any Schedule to this Agreement or required to be disclosed pursuant to this Section is a valid and binding agreement of the Company or a Subsidiary, as the case may be, and is in full force and effect, and none of the Company, any Subsidiary or, to the Knowledge of the Company, any other party thereto is in default or breach in any material respect under the terms of any such material Contract, and, to the Knowledge of the Company, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any material default thereunder.  True and complete copies of each such Contract have been delivered or made available to the Buyer.

Section 3.12.    *Litigation*.  As of the date hereof, except for the Reorganization Cases or as set forth on Schedule 3.12, (a) there is no material suit, litigation, proceeding (administrative, judicial, or in arbitration, mediation or alternative dispute resolution), government or other action pending, (b) to the Knowledge of the Company, there is no material claim or grand jury investigation pending or (c) to the Knowledge of the Company, there is no material suit, claim, litigation, proceeding (administrative, judicial, or in arbitration, mediation or alternative dispute resolution), grand jury investigation, government or other action (any of the foregoing, an "**Action**") threatened against or affecting the Company or any Subsidiary or any of their respective businesses or properties, or, in connection with their respective businesses, any of their shareholders, directors, officers, agents, or other personnel, including without limitation any Action which seeks to restrain or prohibit or otherwise challenges the consummation, legality or validity of the transactions contemplated hereby.  As of the date hereof, except for the Reorganization Cases or as set forth on Schedule 3.12, (x) neither the Company nor any Subsidiary is or has been, since January 1, 2002, subject to any material Order other than Orders of general applicability or Orders of the Bankruptcy Court and (y) neither the Company nor any Subsidiary has been (or, to the Knowledge of the Company, threatened to be) a party or subject to any material Action or Order relating to personal injury, death, or property or economic damage arising from the conduct of either of the Company's or any Subsidiary's business.

Section 3.13.    *Compliance with Laws and Court Orders*.  Neither the Company nor any Subsidiary is in violation of, and has not since January 1, 2002 violated, and to the Knowledge of the Company is not under investigation with respect to and has not been threatened to be charged with or given notice of any violation of, any applicable law, rule, regulation or Order, except for violations that have not had, individually or in the aggregate, a Material Adverse Effect.

Section 3.14.    *Properties*.

(a)    Neither the Company nor any Subsidiary owns any real property.  The Company and the Subsidiaries have a valid leasehold interest in all leases of real property to which any of them is a party (collectively, the "**Leases**").  A true and correct list of each such Lease is contained on Schedule 3.14(a).  Each such Lease is a valid and binding agreement of the Company or a Subsidiary, as the case may be, and is in full force and effect.  None of the Company, any Subsidiary or, to the Knowledge of the Company, any other party thereto is in default or breach in any material respect under the terms of any such material Lease, and, to the Knowledge of the Company, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a material default thereunder.

(b)    With respect to all property and assets other than real property ("**Other Property**"), the Company and the Subsidiaries have good and valid title to, or a valid leasehold interest in, the Other Property (whether personal, tangible or intangible) used by them, located on their premises or reflected on the Balance Sheet or acquired after the Balance Sheet Date, except for any Other Property sold since the Balance Sheet Date in the ordinary course of business consistent with past practices and except for defects in title or in the validity of leasehold interests that would not result in a material liability to the Company and the Subsidiaries.

(c)    No Lease or Other Property is subject to any Lien, except:

(i)    as of the date hereof, Liens disclosed on the Balance Sheet or on the Interim Balance Sheet;

(ii)    Liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Balance Sheet);

(iii)    Liens created by operation of law;

(iv)    Liens under the Post-Petition Bank Credit Agreement (which will be released at Closing);

(v)    Liens disclosed on Schedule 3.14(c) hereto; and

(vi)    Liens which do not materially detract from the value or materially interfere with any present or intended use of such property or assets (clauses (i) through (vi) of this Section 3.14 are, collectively, the "**Permitted Liens**").

Section 3.15.    *Intellectual Property*.

(a)    The Company and the Subsidiaries have no material patent registrations or applications or copyright registrations or applications.  Schedule 3.15(a) contains a complete and accurate list of all of the Trademark registrations and applications of the Company and the Subsidiaries and all material Contracts relating to the other Intellectual Property Rights, and the Company has delivered or caused to be delivered to Buyer accurate and complete copies of all such Contracts ("**Intellectual Property Contracts**"), except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs with a value of less than $1,000 under which the Company or any Subsidiary is the licensee.  All Intellectual Property Contracts are valid and binding agreements of the Company or a Subsidiary, as the case may be, and are in full force and effect, and none of the Company, any Subsidiary or, to the

Knowledge of the Company, any other party thereto is in default or breach in any material respect under the terms of any such material Intellectual Property Contract, and, to the Company's Knowledge, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a material default thereunder.

(b)     The Company and the Subsidiaries collectively have ownership or valid and legally enforceable rights to use all material Intellectual Property Rights necessary for the conduct of the business of the Company and its Subsidiaries as currently conducted, free and clear of all Liens (other than Permitted Liens).  To the Company's Knowledge, none of the Intellectual Property Rights used by the Company or the Subsidiaries conflicts with or infringes the rights of any Person.  The Company and the Subsidiaries collectively have sole, full, and clear title (except with respect to Permitted Liens) to the trademark registrations set forth on Schedule 3.15(b) (the "**Specified Registrations**") for the goods and services named therein, and the Specified Registrations are valid and subsisting and in full force and effect.  There is no action or proceeding pending or, to the Knowledge of the Company, threatened challenging the validity or ownership of any Specified Registration.

(c)     No Intellectual Property Right used or held for use by the Company or any of the Subsidiaries, or necessary for the conduct of the business of the Company and the Subsidiaries as currently conducted, is subject to any outstanding claim, audit, demand, Order, stipulation or agreement restricting the use thereof by the Company or any of the Subsidiaries or restricting the licensing thereof by the Company or any of the Subsidiaries to any Person, except as set forth on Schedule 3.15(c) and except for any claim, audit, demand, Order, stipulation or agreement which has not had, individually or in the aggregate, a Material Adverse Effect.

(d)     To the Knowledge of the Company, no Person is infringing, misappropriating or violating any Intellectual Property Right of the Company or any Subsidiary.

(e)     Substantially all current non-union, non-retail employees of the Company and each of the Subsidiaries, and any other persons who have created any material portion of the Intellectual Property Rights, have executed a written acknowledgement to the Company containing a provision in the form set forth on Schedule 3.15(e) hereto.

Section 3.16.     *Insurance Coverage*.  The Company and its Subsidiaries have at all times maintained: (i) general comprehensive liability insurance against such risks as are customarily insured against by companies similar to the Company and the Subsidiaries and in at least such amounts as are usually carried by persons engaged in the same or a similar business, and (ii) insurance as required by law or under any agreement to which the Company and the Subsidiaries is or has been a party, including without limitation, unemployment and workers' compensation coverage.  A list of each such insurance policy is set forth on Schedule 3.16.  All such insurance policies and fidelity bonds relating to the assets, business, operations, employees, officers or directors of the Company and the Subsidiaries have been in effect since January 1, 2003 and remain in full force and effect.

Section 3.17.     *Permits*.  The Company and the Subsidiaries have all material governmental licenses, franchises, permits, certificates, approvals or other similar authorizations ("**Permits**") required for the ownership or occupancy of its properties and assets and the carrying on of its business.  The Permits are valid and in full force and effect, neither the Company nor any Subsidiary is in default in any material respect under, and no condition exists that with notice or lapse of time or both would constitute a material default under, the Permits and none of the

Permits will be terminated or impaired or become terminable, in whole or in part, as a result of the transactions contemplated hereby, except as is not material.

Section 3.18. *Inventories.* The inventories set forth in the Balance Sheet and the Interim Balance Sheet were properly stated therein at the lesser of cost or fair market value determined in accordance with GAAP consistently applied. Since the Interim Balance Sheet Date, the inventories of the Company and its Subsidiaries have been maintained in the ordinary course of business consistent with past practice. Neither the Company nor any Subsidiary is in possession of any inventory not owned by it, including goods already sold, other than goods held on consignment having a value not exceeding $416,726 (as of May 5, 2003) in the aggregate or as is immaterial in amount.

Section 3.19. *Finders' Fees.* Except for Peter J. Solomon Company, whose fees will be paid by the Estates, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Company or any Subsidiary who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.20. *Labor Matters.* (a) Except as disclosed in Schedule 3.20(a), neither the Company nor any Subsidiary is a party to any collective bargaining or other labor union contract covering any employees of the Company or any Subsidiary, and no employee of the Company or any Subsidiary is represented by any labor union. Except as has not had, individually or in the aggregate, a Material Adverse Effect, the Company and the Subsidiaries are, and at all times have been, in compliance with the terms and requirements of, and are not currently in default under, any collective bargaining or other labor union contract covering any employees of the Company or any Subsidiary.

(b) There is no labor strike, dispute, slowdown, or stoppage pending or, to the Knowledge of the Company, threatened against the Company or any Subsidiary which, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. Except as set disclosed in Schedule 3.20(b), no collective bargaining agreement is currently being negotiated and no organizing effort is currently being made with respect to the Company's or any Subsidiary's employees.

(c) The Company and the Subsidiaries are in compliance in all material respects with all currently applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and are not engaged in any unfair labor practice, failure to comply with which or engagement in which, as the case may be, has had, individually or in the aggregate, a Material Adverse Effect. There is no unfair labor practice complaint pending or, to the Knowledge of the Company, threatened against the Company or any Subsidiary before the National Labor Relations Board.

Section 3.21. *Employee Benefit Plans.* (a) Schedule 3.21(a) lists each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each profit sharing, deferred compensation, bonus or other incentive compensation, stock option, stock purchase, retirement, health, vacation, severance, disability, life insurance, tuition reimbursement, leave of absence, company car and club dues plan, program or policy maintained by the Company or any Subsidiary except as required to be maintained by law (each, an "Employee Plan"). Schedule 3.21(a) also lists each material employment agreement maintained by the Company or any Subsidiary (each, an "Employee Agreement"). The Company has made available to the Buyer correct and complete copies of (i) each Employee Plan and each Employee Agreement (or, in the

case of any such Employee Plan or Employee Agreement that is unwritten, descriptions thereof), (ii) the most recent annual reports on Form 5500 required to be filed with the Internal Revenue Service with respect to each Employee Plan (if any such report was required), (iii) the most recent summary plan description for each Employee Plan for which such summary plan description is required and (iv) each trust agreement and insurance or group annuity contract relating to any Employee Plan. Each Employee Plan and each Employee Agreement has been administered in all material respects in accordance with their terms. Each Employee Plan is, and the Company and its Subsidiaries in respect of such Employee Plan are, in compliance in all material respects with the applicable provisions of ERISA, the Code and all other applicable laws, including Section 4980B of the Code, Part 6 of Subtitle B of Title I of ERISA and Section 1862(b)(4)(A)(i) of the Social Security Act. To the Knowledge of the Company, the Subsidiaries in respect of each employee benefit plan required by law to be maintained or contributed to by the Subsidiaries with respect to any non-U.S. employees are in compliance in all material respects with applicable laws, except where failure thereof would not have a Material Adverse Effect.

(b) To the Knowledge of the Company, (i) each Employee Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) intended to be tax qualified under Section 401(a) of the Code (each, a "**Pension Plan**") is so qualified, (ii) the trust maintained pursuant thereto is exempt from federal income taxation under Section 501(a) of the Code, (iii) each such Pension Plan has received a favorable determination letter from the Internal Revenue Service, and (iv) no event has occurred since the date of the most recent determination letter or application therefor relating to any such Pension Plan that would adversely affect the qualification of such Pension Plan or the exemption of such trust. The Company has made available to the Buyer a correct and complete copy of the most recent determination letter received with respect to each Pension Plan, as well as a correct and complete copy of each pending application for a determination letter, if any. No Pension Plan is subject to Title IV of ERISA.

(c) All contributions, premiums and benefit payments under or in connection with the Employee Plans and Multiemployer Plans to which the Company or any Subsidiary contributes or is required to contribute that are required to have been made as of the date hereof in accordance with the terms of such plans have been timely made. No Pension Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(d) Except as set forth on Schedule 3.21(d), neither the Company nor any Subsidiary contributes to any Multiemployer Plan. Except as set forth on Schedule 3.10(b) and, to the Knowledge of the Company, no Multiemployer Plan has made a claim for withdrawal liability against the Company or any Subsidiary.

(e) To the Knowledge of the Company, neither the Company nor any Subsidiary nor any "party in interest" or "disqualified person" with respect to an Employee Plan has engaged in any non-exempt "prohibited transaction" in violation of Section 4975 of the Code or Section 406 of ERISA which would result in a material liability to the Company.

(f) The Company has not terminated any Pension Plan subject to Title IV of ERISA since January 1, 2002.

Section 3.22.    *Environmental Matters.*

(a)    Each of the Company and the Subsidiaries (including each of their respective assets, operations and real estate) is in compliance in all material respects with all Environmental Laws, which compliance includes obtaining, maintaining and complying with all material permits, registrations, licenses or authorizations required by Environmental Laws.

(b)    (x) There is no suit, claim, action or proceeding pending, (y) to the Knowledge of the Company, there is no investigation pending, and (z) to the Knowledge of the Company, there is no suit, claim, action, proceeding or investigation threatened against or affecting the Company or any of the Subsidiaries or any real property owned, operated or leased by the Company or any of the Subsidiaries alleging material non-compliance with or potential material liability under Environmental Laws.

(c)    Except with respect to matters that have been resolved in compliance with Environmental Laws, neither the Company nor any of the Subsidiaries has received any notice of or knowingly entered into or assumed by contract any material obligation, material liability, Order, settlement, judgment, injunction or decree relating to or arising under Environmental Laws.

(d)    To the Knowledge of the Company, there has been no spill, discharge, leak, leaching, emission, migration, injection, disposal, escape, dumping, or release of any Hazardous Materials at any property owned or leased by the Company or the Subsidiaries which could reasonably be expected to result in the Company incurring material liabilities under Environmental Laws.

This Section 3.22 contains the sole and exclusive representations and warranties of the Company regarding environmental matters.

Section 3.23.    *Agreed-to Working Capital.*  Agreed-to Working Capital is equal to the Net Working Capital as of the Balance Sheet Date, calculated as set forth on Schedule 3.23.

Section 3.24.    *Accounts Receivables.*  Set forth in Schedule 3.24(a) is a list of sub-accounts, which, in the aggregate, comprise the consolidated accounts receivable of the Company.  Set forth in Schedule 3.24(b) is a reconciliation of the CIT Group/Commercial Services, Inc. Client Aged Accounts Receivable Summary to the A/R – Regular Trade (Factored) general ledger balance.  Set forth in Schedule 3.24(c) is the CIT Group/Commercial Services, Inc. Client Aged Accounts Receivable Summary.  Except as set forth on Schedule 3.24, the accounts receivable set forth in the Balance Sheet and the Interim Balance Sheet were properly stated therein in accordance with GAAP consistently applied.  Such accounts receivable of the Company and its Subsidiaries have arisen in good faith in the ordinary course of business consistent with past practice.

Section 3.25.    *Officers, Directors, Employees and Consultants.*  Set forth on Schedule 3.25 is a list of: (a) all current directors of the Company and each Subsidiary, (b) all current officers (with office held) of the Company and each Subsidiary, (c) all employees (active or other) of the Company and each Subsidiary, who receive annual compensation of $100,000 or more, and (d) all current paid consultants to the Company and each Subsidiary who receive annual compensation of $100,000 or more or who may not be terminated by the Company on 60 days' notice without a penalty being incurred by the Company.

Section 3.26.    *Books and Records*.  The books of account, stock record books, minute books, bank accounts, and other corporate records of the Company and each Subsidiary are true, correct, and complete in all material respects, and have generally been maintained in accordance with good business practices.

Section 3.27.    *Factories*.  Except as set forth on Schedule 3.27, neither the Company nor any Subsidiary relies on any single mill for more than 15.0% of its piece goods or factory for more than 10.0% of its finished goods (by aggregate volume purchased).  The Company's Contractor Manual, which has been provided to Buyer, is the only manual of the Company relating to compliance by each manufacturing facility operated by the Company or any Subsidiary or any manufacturing facility operated by a third party which supplies products to the Company or any Subsidiary, with all applicable foreign and domestic national, federal, provincial, state, county and municipal statutes, laws, ordinances, regulations, rules or orders regarding use of child labor, safety for workers, human rights and similar concepts.

Section 3.28.    *Company SEC Documents*.

(a)    The Company has filed all reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) with the Securities and Exchange Commission ("**SEC**") required to be filed by the Company since January 1, 2001 (collectively, the "**Company SEC Documents**").  As of their respective dates, the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such Company SEC Documents, and, as of their respective dates, none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)    The financial statements of the Company included in the Company SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as of their respective dates, were prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented in all material respects the financial position of the Company and its consolidated subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

Section 3.29.    *Leslie Fay Settlement*.  The Commonwealth of Pennsylvania has received the settlement payment contemplated by that certain Stipulation for Judgment dated August 27, 2002 regarding the case Leslie Fay Co Inc vs. Commonwealth of Pennsylvania in the Commonwealth Court of Pennsylvania, No. 0578 Finance & Revenue, 2000.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Company, as of the date hereof and as of the Closing Date, that:

Section 4.01. *Corporate Existence and Power.* The Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all powers (corporate, partnership or otherwise) and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02. *Corporate Authorization.* The execution, delivery and, performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the powers (corporate, partnership or otherwise) of the Buyer and have been or will have been duly authorized by all necessary action on the part of the Buyer. This Agreement constitutes a valid and binding agreement of the Buyer.

Section 4.03. *Consents and Authorizations.* The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby require no action, consent or approval by or in respect of, or filing with, any Person or Governmental Regulatory Authority other than (i) compliance with any applicable requirements of the HSR Act and (ii) consents, approvals or actions of, and filings with or notice to the Bankruptcy Court.

Section 4.04. *Noncontravention.* The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the organizational documents of the Buyer or (ii) assuming compliance with the matters referred to in Section 4.03, violate any applicable law, rule, regulation or Order, except for any such violations which have not had, individually or in the aggregate, a Buyer Material Adverse Effect.

Section 4.05. *Financing.* The Buyer has access to the capital necessary to fund the Unadjusted Purchase Price and any other amounts to be paid by it hereunder.

Section 4.06. *Purchase for Investment.* The Buyer is purchasing the Shares for investment and not with a view to, or for sale in connection with, any distribution thereof. The Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

Section 4.07. *Litigation.* There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Buyer threatened against or affecting, the Buyer before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement, or that has had, individually or in the aggregate, a Buyer Material Adverse Effect.

Section 4.08. *Scope of Representations and Warranties of the Company.* The Buyer acknowledges that neither the Company nor any of its Affiliates, nor their agents,

representatives, employees and officers, makes or has made any representation or warranty, either express or implied, with respect to the Company, the Shares or otherwise or with respect to any information provided or made available to the Buyer or any of its Affiliates, representatives or agents, except as and only to the extent expressly set forth in Article 3 and Article 8 (which are qualified by, and subject to the limitations and restrictions contained in this Agreement).

Section 4.09. *Brokers and Other Advisors.* No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

ARTICLE 5

COVENANTS OF THE COMPANY

The Company agrees that:

Section 5.01. *Conduct of the Company.* Except as set forth on Schedule 5.01, from the date hereof until the Closing Date, the Company shall, and shall cause the Subsidiaries to, conduct its businesses in the ordinary course of business consistent with past practice and to use its reasonable best efforts to preserve intact its business organizations and relationships with third parties and to keep available the services of its present officers and employees. Without limiting the generality of the foregoing, from the date hereof until the Closing Date, the Company, except as set forth on Schedule 5.01, will not, and will not permit any Subsidiary to:

(a) adopt or propose any change in its certificate of incorporation or bylaws, except, as contemplated by this Agreement, upon the confirmation of the Plan by the Bankruptcy Court;

(b) merge or consolidate with any other Person or (other than in the ordinary course of business) acquire a material amount of assets from any other Person;

(c) sell, lease, license or otherwise dispose of any material assets or property except (i) pursuant to existing Contracts or commitments not rejected by the Company or any Subsidiary prior to the date hereof and (ii) in the ordinary course of business consistent with past practice;

(d) declare, set aside or pay any dividend or other distribution of cash or other property with respect to any shares of capital stock of such Person, or repurchase, redeem or otherwise acquire any outstanding shares of capital stock or other securities of such Person; or

(e) without the written consent of the Buyer, assume or reject any contract, lease or other agreement under Section 365 of the Bankruptcy Code.

Section 5.02. *Access to Information.* From the date hereof until the Closing Date, the Company will (i) upon reasonable prior notice, give, and will cause each Subsidiary to give, the Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access during normal business hours to the offices, properties, books and records of the Company and the Subsidiaries, (ii) furnish, and will cause each Subsidiary to furnish, to the Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Company or any Subsidiary as such

Persons may reasonably request and (iii) instruct the employees, counsel and financial advisors of the Company or any Subsidiary to cooperate with the Buyer in its investigation of the Company or any Subsidiary. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Company and the Subsidiaries. Notwithstanding the foregoing, the Buyer shall not have access to personnel records of the Company and the Subsidiaries relating to individual performance or evaluation records, medical histories or other information which in the Company's good faith opinion is sensitive or the disclosure of which could subject the Company or any Subsidiary to risk of liability.

Section 5.03. *Notices of Certain Events*. The Company shall promptly notify Buyer of:

(a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b) any notice or other communication from any Governmental or Regulatory Authority in connection with the business operations of the Company or the transactions contemplated by this Agreement;

(c) any actions, suits, claims, investigations or proceedings pending or, to its Knowledge, threatened against or relating to the Company or any Subsidiary that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.12 or that would reasonably be expected to affect the consummation of the transactions contemplated by this Agreement;

(d) any objection to, or appeal from, the (i) Approval Order, (ii) Administrative Claim Bar Date Order, (iii) approval of the Disclosure Statement or (iv) entry of the Confirmation Order; and

(e) any event or occurrence that would cause any representation or warranty of the Company to be untrue in any material respect.

Section 5.04. *Disclosure Statement and Plan*. (a) Not later than ten (10) Business Days after the Bankruptcy Court enters the Approval Order or such longer period as may be agreed to by the Company and the Buyer, the Company and the other Debtors shall file the Plan with the Bankruptcy Court and seek approval from the Bankruptcy Court of a Second Amended and Restated Disclosure Statement, consistent with the terms and conditions set forth in this Agreement and subject in form and substance to the reasonable approval of the Buyer (the "**Disclosure Statement**"), recommending the approval of the Plan. Without limiting the foregoing, the Plan will provide for payment and satisfaction of all Excluded Liabilities. All Old Common Stock and any rights to purchase Old Common Stock will be discharged, cancelled or otherwise terminated pursuant to the Plan and upon consummation of the transactions contemplated hereby. All information concerning the Company and the other Debtors provided by the Company and/or the other Debtors and contained in the Disclosure Statement shall be, as applicable, accurate in all material respects and shall comply with the requirements of the Bankruptcy Code and other applicable law. The Company shall promptly notify the Buyer if at any time before the Effective Date it becomes aware that the Disclosure Statement contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which

they were made, not misleading. In such event, the Company shall make the appropriate filings with the Bankruptcy Court regarding such misstatement or omission and take such other actions to address such misstatement or omission as required by the Bankruptcy Court.

(b)     Upon approval of the Disclosure Statement by the Bankruptcy Court, the Company and the other Debtors shall transmit the Disclosure Statement to holders of claims and equity interests in the Reorganization Cases. The Company shall use, and cause each of the other Debtors to use, their reasonable best efforts to solicit acceptance of the Plan and obtain the entry of the Confirmation Order (including by seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code in the event any class of claims or interests shall have failed to accept the Plan or in the event any such class is deemed to have rejected the Plan) as soon as practicable after approval of the Disclosure Statement. Prior to the filing by Debtors of any amendment or supplement to the Plan or the Disclosure Statement, or any motion or other pleading describing or affecting the transactions contemplated by this Agreement, the Company shall provide a copy thereof to the Buyer and its counsel, and the Buyer and its counsel shall be given a reasonable opportunity to review and comment on such amendment, supplement, motion or pleading. The Company shall provide to the Buyer and to counsel for the Buyer copies of any and all pleadings filed by the Debtors (or any of them) with respect to the Reorganization Cases.

(c)     If the Confirmation Order or any other Order of the Bankruptcy Court relating to (i) this Agreement, (ii) the Disclosure Statement, (iii) the solicitation of acceptance of the Plan, or (iv) confirmation of the Plan, shall be appealed by any party (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), the Company agrees to take such steps, if any, as may be reasonable and appropriate to prosecute in good faith such appeal, petition or motion, or defend against such appeal, petition or motion, at the cost and expense of the Company, and to use reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion, all with the objective of effecting the transactions contemplated by this Agreement; provided that nothing herein shall require the Company to appeal from an Order as to which the Company does not believe bona fide grounds for appeal exist.

(d)     The Estate Representative shall not, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld) file any pleading or take other action in the Bankruptcy Court with respect to this Agreement, the Plan or the consummation of the transactions contemplated hereby or thereby that is inconsistent with the full performance and implementation of the provisions of this Agreement, subject to the fiduciary duties of the Company; provided, however, that nothing contained in the foregoing shall be construed to limit in any way the Estate Representative's rights under this Agreement, including the Estate Representative's rights under Article 11 hereof, or to limit the Estate Representative's rights to advocate for the approval of this Agreement and against any alternative transaction or plan of reorganization that does not effectuate the transactions contemplated by this Agreement.

ARTICLE 6

COVENANTS OF THE BUYER

The Buyer agrees that:

Section 6.01.     *Confidentiality*. Prior to the Closing and after any termination of this Agreement, the provisions of the Confidentiality Agreement, dated January 15, 2003, between the Company and the Buyer (the "**Confidentiality Agreement**") shall continue in full force and effect. Notwithstanding anything to the contrary contained herein or in the

Confidentiality Agreement, the Confidentiality Obligations as they relate to the transactions contemplated by this Agreement shall not apply to the "tax structure" or "tax treatment" of such transactions (as these terms are used in the Confidentiality Regulations) and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the "tax structure" and "tax treatment" of the transactions contemplated by this Agreement and any materials of any kind (including any tax opinions or other tax analyses) that relate to the "tax treatment" and "tax structure." In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to any tax matter or tax idea related to the transactions contemplated by this Agreement. The preceding sentence is intended to ensure that the transactions contemplated by this Agreement shall not to be treated as having been offered under conditions of confidentiality for purposes of the Confidentiality Regulations and shall be construed in a manner consistent with such purpose.

Section 6.02. *Bankruptcy Court Approvals.* (a) The Buyer shall assist and cooperate with the Debtors in seeking approval of the Disclosure Statement and confirmation of the Plan. The Buyer shall not, without the prior written consent of the Company (which consent shall not be unreasonably withheld) file any pleading or take other action in the Bankruptcy Court with respect to this Agreement, the Plan or the consummation of the transactions contemplated hereby or thereby that is inconsistent with the full performance and implementation of the provisions of this Agreement; provided, however, that nothing contained in the foregoing shall be construed to limit in any way the Buyer's rights under this Agreement, including the Buyer's rights under Article 11 hereof, or to limit the Buyer's or its Affiliates' rights to advocate for the approval of this Agreement and against any alternative transaction or plan of reorganization that does not effectuate the transactions contemplated by this Agreement.

(b) All information concerning the Buyer provided in writing to the Company by the Buyer expressly for inclusion in the Disclosure Statement is or shall be accurate in all material respects. The Buyer shall promptly notify the Company and the other Debtors if at any time before the Effective Date it becomes aware that the Disclosure Statement contains any untrue statement of a material fact with respect to the Buyer or omits to state a material fact required to be stated therein or necessary to make the statements contained therein with respect to the Buyer, in light of the circumstances under which they were made, not misleading.

(c) If the Confirmation Order or any other Orders of the Bankruptcy Court relating to (i) this Agreement, (ii) the Disclosure Statement, (iii) the solicitation of acceptance of the Plan, or (iv) confirmation of the Plan, shall be appealed by any party (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), the Buyer agrees to take such steps, if any, as may be reasonable and appropriate to join in and prosecute such appeal, petition or motion or defend against such appeal, petition or motion and to use reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion, with the objective of effecting the transactions contemplated by this Agreement; provided, that such reasonable efforts obligation shall not obligate the Company to expend monies or to pay a disputed claim against the Company.

# ARTICLE 7

## COVENANTS OF THE BUYER AND THE COMPANY

The Buyer and the Company agree that:

Section 7.01. *Conditions Precedent to Effectiveness of Agreement; Bid Protection*.

(a)  Promptly after all bidding at the Auction has concluded, the Debtors shall file the Notice and Report as contemplated by the Bid Procedures Order and submit this Agreement (and the transactions contemplated by this Agreement) at the Approval Hearing (as that term is defined in the Bid Procedures Order) for formal approval by the Bankruptcy Court in an Order (the "**Approval Order**").  This Agreement shall not be enforceable against the Company until such time as the Bankruptcy Court shall have entered the Approval Order.

(b)  After entry of the Approval Order, the Shares shall not be offered to any Person other than the Buyer unless the Buyer fails to perform its material obligations under this Agreement.

Section 7.02. *Further Assurances.*  Subject to the terms and conditions of this Agreement, the Buyer and the Company will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement. The Company and the Buyer agree, and the Company, prior to the Closing, and the Buyer, after the Closing, agree to cause the Company and each Subsidiary, to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.  If following the Closing Date there exists any Lien upon any asset of the Company that arose by operation of law and that relates to an Excluded Liability, the Estate Representative shall, reasonably promptly upon notification thereof by the Buyer, discharge such liability or otherwise cause such Lien to be released.

Section 7.03. *Certain Filings.*  (a)  Promptly following the issuance of the Approval Order, the Estates and the Buyer will each prepare and file a notification with the United States Department of Justice and the Federal Trade Commission, as required by the HSR Act.  The Estates and the Buyer will cooperate with each other in connection with the preparation of such notification, including sharing information concerning sales and ownership and such other information as may be needed to complete such notification, and providing a copy of such notification to the other prior to filing.  Each of the Estates and the Buyer will keep confidential all information about the other obtained in connection with the preparation of such notification. In addition, each party agrees to make promptly any filing that may be required under any other antitrust or competition law or by any other antitrust or competition authority.  Buyer and Seller will cooperate to respond to all inquiries and requests for further information associated with the HSR Act filing and any filing that may be required under any other antitrust or competition law or by any other antitrust or competition authority.  The Buyer and the Estates shall each have responsibility for one-half of the aggregate filing fees associated with the HSR Act filings and any other similar filings required in any other jurisdictions.

(b)  The Estates and the Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental or

Regulatory Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.04.    *Public Announcements.*  The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public statements the making of which may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

Section 7.05.    *Supplementation and Amendment of Schedules.*

(a)    From time to time prior to the Closing, the Company shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement that, if existing or known at, or occurring prior to, the date of this Agreement, would have been required to be set forth or described in such Schedules.  No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Section 9.02(a); provided, however, if the Closing shall occur, then, unless otherwise agreed to in writing, the Buyer shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or to otherwise with respect to any and all matters disclosed pursuant to any such supplement or amendment and delivered to Buyer at least two Business Days prior to the Closing.  For purposes of clarity, from time to time prior to the Closing, the Company shall supplement Schedule 3.11(a)(y) to include any Contract rejected or to be rejected by the Company or the Subsidiaries as contemplated by Sections 3.11 and 5.01, and the reference to Schedule 3.11(a)(y) in Section 2.06(b) shall be deemed to be a reference to such Schedule, as supplemented.

(b)    At any time and from time to time after the date of this Agreement but at least 20 Business Days prior to the Effective Date (unless such date is otherwise shortened by the Bankruptcy Court), the Buyer may give notice to the Company that one or more executory Contracts listed in Schedule 3.11(a)(x) (and not assumed by the Company prior to July 31, 2003 or included in the Schedule 3.11(a)(y) attached to this Agreement at July 31, 2003) should be rejected by the Company or a Subsidiary, as applicable, in which event:

(i)    the Company or Subsidiary, as applicable, will file a motion with the Bankruptcy Court seeking an order authorizing the rejection of the executory Contract(s) identified in the Buyer's notice;

(ii)    the Company shall amend Schedules  3.11(a)(x) and 3.11(a)(y), accordingly; and

(iii)    the Purchase Price shall be increased by an amount equal to the Rejected Contract Claims as provided in Section 2.03(g).

Section 7.06.    *Preservation of and Access to Books and Records; Cooperation*. The Buyer agrees that, for a period of one year from the Closing Date (or for such longer period of time not to exceed six (6) additional months as the Estates may reasonably require), it shall cause the Company, without cost or expense to the Estates, to (i) preserve and keep intact the

Company's books and records as in existence as of the Closing Date, (ii) make such books and records, and the Company's officers, employees, consultants, agents, accountants, attorneys and other representatives, available to the Estates, at reasonable times, upon reasonable prior notice, under reasonable circumstances and as may be reasonably required by the Estates, in connection with the filing of any Tax Returns pursuant to Section 8.02 hereof, the consummation of the Plan, the resolution of all claims against the Company that are disputed by the Company, the distribution of all funds to which creditors of the Company are entitled under the Plan, the wind down of the Estates and the closing of the Reorganization Cases, (iii) allow the Estates to make extracts and copies of such books and records, (iv) provide office space for one person for the use of the Estates (at a reasonable location and under reasonable circumstances) and (v) cooperate reasonably, and cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate reasonably, with the Estates in connection with the foregoing. Notwithstanding the foregoing, the Buyer shall be entitled to reasonable compensation for the time expended by the Company's officers, employees, consultants, agents, accountants, attorneys and other representatives if the time required to comply with the foregoing covenants is unreasonably excessive.

Section 7.07. *Administrative Claim Bar Date.* The Estates shall seek and obtain an administrative claims bar date from the bankruptcy court (the "**Admin Bar Date**") with respect to any and all claims having priority for payment from the Estates under Bankruptcy Code § 503 (other than claims for goods and services provided to the Company in the ordinary course of business prior to the Effective Date, compensation claims of employees under contract, professional fees and expense claims and claims by parties seeking cure for executory contracts and unexpired leases assumed pursuant to the Plan or Section 365 of the Bankruptcy Code) (the "**Administrative Claim Bar Date Order**"), which Admin Bar Date shall be set no later than thirty (30) days prior to Closing. Immediately following the Admin Bar Date, the Buyer and Estates shall determine which of the administrative claims filed against the Estates shall constitute Assumed Liabilities.

ARTICLE 8

TAX MATTERS

Section 8.01. *Representations and Warranties.* Except to the extent set forth on Schedule 8.01, the Company represents and warrants to Buyer as of the date hereof and as of the Closing Date that:

(a)     All Tax Returns required to be filed by, or with respect to, the Company or the Subsidiaries have been filed (or requests for extension of time to file have been properly filed) and all Taxes that were shown to be due on such Tax Returns have been paid (or adequate reserves have been established on the Company's books and records), except where the failure to file such Tax Returns or to pay such Taxes would not reasonably be expected to be material.

(b)     Other than any Taxes as to which a proof of claim has been filed by a Taxing Authority in the Reorganization Cases, all material Excluded Taxes due and owing by the Company and its Subsidiaries (whether or not reflected on any Tax Return) have been paid.

(c)     The Company and its Subsidiaries have withheld and paid all material Excluded Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party,

including any material Excluded Taxes related to the cancellation or satisfaction of intercompany obligations between the Company and its affiliates and the Subsidiaries.

(d)     The Company has given, or otherwise made available to Buyer, correct and complete copies of those portions of all Tax Returns, examination reports and statements of deficiencies relating to the Company and any of its Subsidiaries for periods ending, or transactions consummated, after December 31, 1999.

(e)     There are no outstanding agreements extending or waiving the statutory period of limitation applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from the Company or any of its Subsidiaries for any taxable period, and no power of attorney is currently in force with respect to any matter relating to Taxes of the Company or any of its Subsidiaries.

(f)     No federal, state, local or foreign Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to the Company or any of its Subsidiaries.

(g)     Neither the Company nor any of its Subsidiaries has received from any federal, state, local or foreign Taxing Authority (including jurisdictions where the Company or the Subsidiaries have not filed a Tax Return) any (i) written notice indicating an intent to open an audit or other review; (ii) written request for information related to Tax matters; or (iii) notice of deficiency or proposed adjustments for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company or its Subsidiaries.

(h)     The Company has not received any written notice from a Taxing Authority in a jurisdiction where either the Company or any of its Subsidiaries does not file Tax Returns that such returns are required.

(i)     There are no Liens for Taxes upon the assets or properties owned by the Company or any of its Subsidiaries, except for Permitted Liens.

(j)     Neither the Company nor any of its Subsidiaries (other than A.S.L. Retail Outlets, Inc. and Kasper A.S.L. Europe Ltd.) has ever been a member of an affiliated group filing a consolidated federal income tax return other than a group in which the common parent is the Company.

(k)     Neither the Company nor any of its Subsidiaries is (or ever has been) a party to or bound by any Tax indemnity, Tax sharing, or Tax allocation agreement or arrangement and has not assumed the Tax liability of any other person under contract.

(l)     Neither the Company nor any of its Subsidiaries is a party to any agreement, contract, arrangement or plan that has resulted or would result, separately or in the aggregate, in a payment that would not be fully deductible as a result of Section 162(m) or Section 280G of the Code or any similar provision of foreign, state, or local law.

Section 8.02.     *Preparation of Tax Returns; Payment of Taxes.*

(a)     All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement, if any, shall be borne equally by the Estates and the Buyer; provided, however, that if any such

Taxes are reflected as an "accrued expense and other" liability in the calculation of the Final Working Capital or arise as a result of Section 12.10, the Buyer shall be responsible for all such Taxes. All Taxes referred to in this Section 8.02 shall be paid by the Company when due, and the Company shall file, or cause to be filed, all necessary Tax Returns and other documentation with respect to any such transfer, documentary, sales, use, stamp, registration and other Taxes and fees. The Estates or the Estate Representative shall promptly pay the portion of such Taxes for which it is responsible pursuant to this Section 8.02(a) to the Buyer after the Buyer furnishes the Estates or the Estate Representative with a copy of the applicable Tax Return and any other supporting documentation.

       (b)       Preparation and Filing of Tax Returns.

       (i)       The Company shall prepare and file, or cause to be prepared and filed, all Tax Returns for the Company and the Subsidiaries that are required to be filed on or prior to the Closing Date. The Company shall pay, or shall cause to be paid, all Taxes shown due on such Tax Returns.

       (ii)       The Estates shall prepare, or cause to be prepared, the Company's and each Subsidiary's Tax Returns for all taxable periods ending on or prior to the Closing Date that are required to be filed after the Closing Date. The Estates shall deliver copies of such Tax Returns to the Buyer for review and approval (such approval shall not be unreasonably withheld) at least twenty (20) days prior to the due date for filing such returns. The Estates shall be responsible for the payment of the portion of such Taxes shown due on such Tax Returns to the extent any such Taxes constitute Excluded Taxes and shall pay such amounts to Buyer within five (5) days prior to the due date for filing such Tax Returns. The Buyer shall cause the Company and the Subsidiaries to timely file such Tax Returns and to remit all Taxes shown due on such Tax Returns.

       (iii)       The Buyer shall prepare, or cause to be prepared, each Straddle Period Return. The Buyer shall deliver copies of each Straddle Period Return to the Estates for review and approval (such approval shall not be unreasonably withheld) at least twenty (20) days prior to the due date for filing such return (accompanied, where appropriate, by an accounting for the portion of such Taxes that constitutes Excluded Taxes). The Estates shall be responsible for the portion of the Taxes shown due on such Tax Returns to the extent any such Taxes constitute Excluded Taxes and shall pay such amounts to Buyer within five (5) days of the due date for filing such Straddle Period Return and Buyer shall be responsible for the balance. The Buyer shall cause the Company and the Subsidiaries to timely file such Tax Returns and to remit all Taxes shown due on such Tax Returns.

       (iv)       Notwithstanding anything to the contrary herein, if a dispute arises (and is not resolved within ten (10) days prior to the due date of the Tax Return) with regard to the amount of Excluded Taxes that the Estates owe in respect of any Tax Return described in Section 8.02(b)(ii) or 8.02(b)(iii), the Estates shall pay to the Buyer the amount that the Estates believe is owing and the parties shall resolve their dispute through the Accounting Referee. The Accounting Referee's determination shall be final and binding on both parties and its expenses shall be borne equally by both parties. Within five (5) days following resolution of the dispute, any amounts determined to be due upon final resolution of the dispute shall be promptly paid.

(v)    To the extent permitted by applicable Law or the administrative practice of any Taxing Authority, the taxable year of the Company and each Subsidiary shall close as of the close of business on the Closing Date. The parties hereto, the Company and the Subsidiaries shall not take any position inconsistent with the preceding sentence on any Tax Return.

(vi)    All Tax Returns described in this Section 8.02 shall be prepared in a manner consistent with past practice unless a past practice has been finally determined to be incorrect by the applicable Taxing Authority or a contrary treatment is required by applicable Tax Laws (or the judicial or administrative interpretations thereof).

(vii)    Notwithstanding anything contained herein to the contrary, the Estates (and the Company and/or its Subsidiaries prior to the Closing) may take any actions necessary to reduce or eliminate Taxes for any Tax Returns described in Section 8.02(b)(i) or 8.02(b)(ii) without the consent of the Buyer, including, but not limited to, the defense, compromise or settlement of any audit or any administrative or court proceeding relating to Taxes for periods prior to or ending on the Closing Date or filing an amended Tax Return to obtain a refund for an Excluded Tax; provided, however, if the Estates amend or agree to an audit adjustment on a Tax Return of the Company or its Subsidiaries for a period ending on or prior to the Closing Date and such amendment or adjustment affects the Tax liability of the Company or its Subsidiaries for a period after the Closing, then the Estates or the Estate Representative shall obtain the consent of the Buyer before filing such amendment or agreeing to such adjustment (such consent shall not be unreasonably withheld); provided, however, that in no event shall the Estates (or the Estate Representative) be required to obtain the consent of the Buyer (or the Company or its Subsidiaries after the Closing) to settle or compromise the IRS claim consistent with the terms of the IRS Stipulation attached hereto as Exhibit A. The Buyer, the Estates, the Estate Representative, the Company and its Subsidiaries shall cooperate and take those actions necessary to reduce or eliminate Taxes for any Straddle Period Returns described in Section 8.02(b)(iii). To the extent any of the foregoing requires action to be taken by the Company or any of its Subsidiaries after the Closing Date, the Buyer, Company and its Subsidiaries shall cooperate with the Estates to realize the applicable tax benefit or reduction in Taxes, including the filing of amended Tax Returns (prepared by the Estates or the Estate Representative in the case of amendments to Tax Returns described in Section 8.02(b)(i) or 8.02(b)(ii)).

(viii)    The Company and/or its Subsidiaries shall promptly pay to the Estates any refunds (including interest thereon) received in respect of Excluded Taxes (determined without regard to clause (w) in the definition of Excluded Taxes).

Section 8.03.    *Closing Covenants.*

(a)    Tax Sharing Agreements. Any tax sharing agreement with the Company, its Subsidiaries and any other Person will have been terminated as of the Closing Date and will have no further effect for any taxable year (whether the current year, a future year, or a past year).

(b)    The Plan shall provide for the expeditious payment of all allowed claims for Taxes and no deferral of payment under Section 1129(a)(9)(C) of the Bankruptcy Code shall be sought.

(c)     Except as provided in Section 12.10 hereof, the Company shall not cause any intercompany obligations of the Company and/or its Subsidiaries to be eliminated prior to the Closing Date.

Section 8.04.     *Tax Controversy.*

(a)     The Estates shall have the right, but not the obligation, to exclusively represent the interests of the Company and/or its Subsidiaries in any Tax audit or administrative or court proceeding relating to Taxes for all periods ending on or prior to the Closing Date. Buyer agrees that it will cooperate fully, and shall cause the Company and/or its Subsidiaries to cooperate fully, with the Estates and their counsel in the defense against or compromise of any claim in any such proceeding.

(b)     The Estates (or the Estate Representative) shall have the right, but not the obligation, to jointly represent the interests of the Company and/or its Subsidiaries in any Tax audit or administrative or court proceeding relating to Straddle Period Returns.  Buyer agrees that it will cooperate fully, and shall cause the Company and/or its Subsidiaries to cooperate fully, with the Estates and their counsel in the joint defense against or compromise of any claim in any such proceeding.  Neither the Estates, on the one hand, nor the Buyer, on the other hand, shall settle any dispute relating to a Tax liability attributable to the Company or any Subsidiary, as the case may be, for a Straddle Period Return without the consent of the other; provided, however, that, if the Estates propose to accept a settlement and the Buyer does not consent thereto, the Estates' liability under Article X in respect of such Tax liability shall be limited to the portion of the proposed settlement amount attributable to the portion of such Straddle Period Return that constitutes an Excluded Tax.  The Estates and the Buyer shall each bear their own costs, fees and expenses paid to third parties in the course of such proceeding.

(c)     If any Taxing Authority asserts a claim, makes an assessment or otherwise disputes or affects any Taxes for which the Estates are responsible hereunder, the Buyer shall, promptly upon receipt by the Buyer, the Company or the Subsidiaries of notice thereof, inform the Estates.  The failure of Buyer to timely forward such notification in accordance with the immediately preceding sentence shall not relieve the Estates of their obligation to pay such liability for Taxes except and to the extent that the failure to timely forward such notification actually prejudices the ability of the Estates to contest such liability for Taxes or increases the amount of such Taxes.

ARTICLE 9

CONDITIONS TO CLOSING

Section 9.01.     *Conditions to Obligations of the Parties.*  The obligations of each party to consummate the Closing are subject to the satisfaction or waiver of the following conditions:

(a)     Any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated.

(b)     No provision of any applicable law or regulation and no Order shall prohibit the consummation of the Closing.

(c)　(i) All conditions to the Effective Date set forth in the Plan (including the entry of the Confirmation Order by the Bankruptcy Court) shall have been satisfied or duly waived in accordance with the applicable provisions of the Plan and (ii) the transactions contemplated by the Plan to occur on or prior to the Closing shall have been or shall be consummated simultaneously with the Closing in accordance with the Plan.

(d)　All actions by or in respect of or filings with any governmental body, agency, official or authority required to permit the consummation of the Closing shall have been taken, made or obtained, except for such actions or filings, the absence of which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)　The Approval Order, the Administrative Claim Bar Date Order and the Confirmation Order (each in a form reasonably satisfactory to the Buyer and providing for the effectuation of all of the transactions contemplated by this Agreement and the Plan in accordance with the terms and provisions hereof and thereof) shall each have become a Final Order.

Section 9.02.　*Conditions to Obligation of the Buyer.*  The obligation of the Buyer to consummate the Closing is subject to the satisfaction or waiver of the following further conditions:

(a)　(i) The Company shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date, (ii) the representations and warranties of the Company in this Agreement and in any certificate or other writing delivered by the Company pursuant hereto (A) that are qualified by materiality or Material Adverse Effect shall be true at and as of the Closing Date as if made at and as of such date (except to the extent expressly made as of an earlier date, in which case, as of such date), and (B) that are not qualified by materiality or Material Adverse Effect shall be true in all material respects at and as of the Closing Date as if made at and as of such date (except to the extent expressly made as of an earlier date, in which case, as of such date), and (iii) the Buyer shall have received a certificate signed by the chief financial officer of the Company to the foregoing effect.

(b)　There shall not be instituted or pending any action or proceeding by any governmental authority or agency, domestic or foreign, or before any court or governmental authority or agency, domestic or foreign, seeking to restrain, prohibit or otherwise interfere with the ownership or operation by the Buyer of all or any material portion of the business or assets of the Company.

(c)　Since the date hereof, no event or condition shall have occurred that results in, or would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(d)　The Company shall have delivered to Buyer a stock certificate representing the Shares, as described in Section 2.05.

(e)　The Approval Order and the Confirmation Order shall expressly provide: (i) that the Estates and the Company are authorized to consummate the transactions contemplated by the Agreement and to perform any other act that is necessary or appropriate for the consummation of the transactions contemplated by the Agreement, (ii) that the Shares shall be delivered to Buyer or its designee upon Closing; (iii) that Buyer has acted in "good faith" in connection with the transactions contemplated herein, as provided in Section 363(m) of the

Bankruptcy Code and that all conditions and terms of Section 363(f) of the Bankruptcy Code and the Bankruptcy Rules that are applicable thereto have been satisfied; and (iv) any commissions or fees due to the Company's brokers and investment bankers shall be paid out of the net proceeds of the sale of the Shares.

(f)     Buyer shall have received from the Company such other documents as may be required by the Bankruptcy Court for consummation of the transactions contemplated hereby.

(g)     The IRS Stipulation shall have been executed by all of the parties thereto, approved by the Bankruptcy Court and delivered by the Company to the appropriate Person for submission to the Joint Committee on Taxation of the Congress of the United States.

(h)     The Liens under the Post-Petition Bank Credit Agreement shall have been released (or shall be released concurrently with the Closing) (except in connection with cash borrowings and the letters of credit referred to in Section 2.06(c)).

Section 9.03.     *Conditions to Obligation of the Company*.  The obligation of the Company to consummate the Closing is subject to the satisfaction or waiver of the following further conditions:

(a)     (i) The Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of the Buyer contained in this Agreement and in any certificate or other writing delivered by the Buyer pursuant hereto (A) that are qualified by materiality or Material Adverse Effect shall be true at and as of the Closing Date as if made at and as of such date (except to the extent expressly made as of an earlier date, in which case, as of such date), and (B) that are not qualified by materiality or Material Adverse Effect shall be true in all material respects at and as of the Closing Date as if made at and as of such date (except to the extent expressly made as of an earlier date, in which case, as of such date), and (iii) the Company shall have received a certificate signed by an executive officer in the case of the Buyer.

(b)     The Company shall have received all documents it may reasonably request relating to the existence of the Buyer and the authority of the Buyer to execute, deliver and perform this Agreement (such as organizational documents, bankruptcy related documents, secretarial certificates and the like), all in form and substance reasonably satisfactory to the Company.

(c)     Since the date hereof, no event or condition shall have occurred that results in, or would reasonably be expected to result in, individually or in the aggregate, a Buyer Material Adverse Effect.

## ARTICLE 10

## SURVIVAL AND INDEMNIFICATION

Section 10.01.     *Survival.*  The representations and warranties of the parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing for a period of six months.  Any and all claims for indemnification for breach of a representation or warranty hereunder must be made

pursuant to this Article 10 prior to such date against the party responsible for indemnification hereunder (the "**Indemnifying Party**").

Section 10.02. *Indemnification of Buyer.* The Plan shall provide that the Estate Representative shall hold Buyer, and, from and after the Closing, the Company, and the shareholders, directors, officers, successors, assigns, and agents of each of them (the "**Buyer Indemnified Persons**"), harmless and indemnify each of them from and against, and waives any claim for contribution or indemnity with respect to, any and all claims, losses, damages, liabilities, expenses or costs ("**Losses**"), plus reasonable attorneys' fees and expenses incurred in connection with Losses and/or enforcement of this Agreement, plus interest from the date incurred through the date of payment at two percent above the prime lending rate of Bank of America, N.A. from time to time prevailing (in all, "**Indemnified Losses**") incurred or to be incurred by any of them ("**Buyer Indemnified Losses**") to the extent resulting from or arising out of (i) any breach or violation of the Company's representations, warranties, covenants, or agreements contained in this Agreement or (ii) the Excluded Liabilities.

Section 10.03. *Indemnification of the Estate Representative.* From and after the Closing, the Buyer shall hold the Estate Representative and its members, managers, directors, officers, successors, assigns, and agents (the "**Estate Indemnified Persons**"), harmless and indemnify each of them from and against, and waives any claim for contribution or indemnity with respect to, any and all Indemnified Losses incurred or to be incurred by any of them ("**Estate Indemnified Losses**") to the extent resulting from or arising out of (i) any breach or violation of Buyer's representations, warranties, covenants, or agreements contained in this Agreement or (ii) the Assumed Liabilities.

Section 10.04. *Limitations.*

(a) The Buyer Indemnified Persons shall not be entitled to recover Buyer Indemnified Losses for breaches or violations of the Company's representations or warranties contained in this Agreement unless such Buyer Indemnified Losses exceed $1,000,000 in the aggregate, and only to the extent such Buyer Indemnified Losses exceed such amount, up to a maximum recovery of $7,000,000 (plus any accrued interest in the Indemnity Account).

(b) The Estate Indemnified Persons shall not be entitled to recover Estate Indemnified Losses for breaches or violations of Buyer's representations or warranties contained in this Agreement unless such Estate Indemnified Losses exceed $1,000,000 in the aggregate, and only to the extent such Estate Indemnified Losses exceed such amount, up to a maximum recovery of $7,000,000.

(c) For purposes of this Article 10, "Buyer Indemnified Losses" and "Estate Indemnified Losses" shall not include or be recoverable by any person to the extent insurance proceeds have been recovered with respect to the indemnified matter.

Section 10.05. *Notice of Claim.* In the event that Buyer seeks indemnification on behalf of a Buyer Indemnified Person, or the Estate Representative seeks indemnification on behalf of an Estate Indemnified Person, such party seeking indemnification (the "**Indemnified Party**") shall give written notice to the Indemnifying Party specifying the facts constituting the basis for such claim and the amount, to the extent known, of the claim asserted. The Indemnifying Party shall pay the amount of any non-disputed claim not more than ten days after the Indemnified Party provides notice to the Indemnifying Party of such amount.

Section 10.06. *Right to Contest Claims of Third Persons.* If an Indemnified Party is entitled to indemnification hereunder because of a claim asserted by any claimant (other than an indemnified person hereunder) ("**Third Person**"), the Indemnified Party shall give the Indemnifying Party reasonably prompt notice thereof after such assertion is actually known to the Indemnified Party; provided, however, that the right of a person to be indemnified hereunder in respect of claims made by a Third Person shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is prejudiced thereby. The Indemnifying Party shall have the right, upon written notice to the Indemnified Party, to investigate, secure, contest, or settle the claim alleged by such Third Person (a "**Third Person Claim**"), provided that the Indemnifying Party has unconditionally acknowledged to the Indemnified Party in writing his or its obligation to indemnify the persons to be indemnified hereunder with respect to such Third Person Claim; the Indemnified Party may thereafter participate (but not control) the defense of any such Third Person Claim with its own counsel at its own expense, unless separate representation is necessary to avoid a conflict of interest, in which case such representation shall be at the expense of the Indemnifying Party. If the Indemnifying Party so acknowledges its obligation to indemnify, the Indemnified Party shall be entitled to be reimbursed by the Indemnifying Party for any reasonable costs of the defense the Indemnified Party had theretofore incurred. If the Indemnifying Party does not so acknowledge its obligation to indemnity and assume the defense of any such Third Person Claim, (a) the Indemnified Party shall defend against such claim, provided that any settlement of such claim shall require the prior written consent of the Indemnifying Party, such consent not to be unreasonably withheld or delayed, and (b) the Indemnifying Party may participate in (but not control) the defense of such claim, with its own counsel at its own expense. The parties hereto shall make available to each other all relevant information in their possession relating to any such Third Person Claim and shall cooperate in the defense, negotiation or settlement thereof.

Section 10.07. *Exclusive Remedy.* The provisions of this Article 10 shall constitute the exclusive remedy of the parties hereto with respect to any claims for Indemnified Losses resulting from or arising out of the provisions of this Agreement which may be asserted after the Closing; provided, that the foregoing shall not preclude any claim for fraud.

# ARTICLE 11

# TERMINATION

Section 11.01. *Grounds for Termination.* This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Company and the Buyer;

(b)     by Buyer on the Closing Date if the conditions to Buyer's obligations to close shall not have been fulfilled, provided that Buyer is not in breach of its obligations hereunder;

(c)     by the Company on the Closing Date if the conditions to the Company's obligations to close shall not have been fulfilled, provided that the Company is not in breach of its obligations hereunder;

(d)     by either the Company or the Buyer if the Closing shall not have been consummated on or before October 31, 2003; provided that the Company and the Buyer shall

each have the right to extend such date by up to 30 days upon notice given to the other party by October 31, 2003;

(e)  by either the Company or the Buyer if there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any nonappealable final Order of any court or governmental body having competent jurisdiction (other than the Bankruptcy Court);

(f)  by either the Company or the Buyer if the Bankruptcy Court shall have issued an Order which has become final and nonappealable restricting or restraining in a material manner or enjoining or otherwise prohibiting or making illegal the effectuation of the transactions contemplated by this Agreement or by the Plan (including an Order denying confirmation of the Plan or confirming a plan of reorganization other than the Plan); or

(g)  by the Buyer or the Company if the Plan is not approved by the Bankruptcy Court.

The party desiring to terminate this Agreement pursuant to this Section 11.01 shall give notice of such termination to the other party hereto.

Section 11.02.  *Effect of Termination.*  If this Agreement is terminated as permitted by Section 11.01, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of either party thereto (or their respective directors, officers, employees, agents, consultants, advisors, other representatives, or Affiliates); *provided, however*, that (i) the provisions of this Article 11 and the provisions of Section 6.01 and Article 12 will continue to apply following any such termination; and (ii) nothing contained in this Agreement will relieve any party from any liability arising from such party's (A) willful failure to fulfill a condition to the performance of the obligations of the other party, (B) failure to perform a covenant of this Agreement, or (C) breach of any representation or warranty or agreement contained herein.

Section 11.03.  *Deposit.*  If this Agreement is terminated as permitted by Section 11.01, then within two (2) Business Days after such termination the Company and the Buyer shall deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to pay the Deposit to the Buyer within three (3) Business Days after the Escrow Agent's receipt of such instruction.

ARTICLE 12

MISCELLANEOUS

Section 12.01.  *Notices.*  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to the Buyer, to:

> Jones Apparel Group, Inc.
> 1411 Broadway
> 39th Floor
> New York, New York  10018
> Attention:  Ira M. Dansky
>    Executive Vice President and General Counsel
> Fax:  (212) 790-9988

with copies to:

> Kaye Scholer LLP
> 425 Park Avenue
> New York, New York  10022
> Attention:  Marc Rosenberg and Lynn Toby Fisher
> Fax:  (212) 836-8689

if to the Company, to:

> Kasper A.S.L. Ltd.
> 11 West 42nd Street
> New York, New York  10036
> Attention:  General Counsel
> Fax:  (212) 626-6354

with copies to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York  10153
> Attention:  Jeffrey J. Weinberg and Alan B. Miller
> Fax:  (212) 310-8007

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

Section 12.02.  *Amendments and Waivers*.  (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.03. *Expenses.* Except as otherwise provided in this Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred by the Estates, the Company and the Subsidiaries in connection with this Agreement shall be paid by the Estates and all costs and expenses incurred by the Buyer in connection with this Agreement shall be paid by the Buyer; provided, that (a) the Estates and the Buyer shall share equally the costs incurred in connection with approval under the HSR Act and similar competition laws as provided in Section 7.03(a) and (b) notwithstanding any provisions to the contrary in the Escrow Agreement, as between the Estates and the Buyer the Estates shall pay all costs and expenses of the Escrow Agent, including any reimbursements or other payments required by Section 10 of the Escrow Agreement; *provided, however*, that nothing herein shall relieve the Buyer from any of its obligations to the Escrow Agent under the Escrow Agreement.

Section 12.04. *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except (i) that Buyer may transfer or assign, in whole or from time to time in part, to one or more of its Affiliates, the right to purchase all or a portion of the Shares and (ii) as set forth in Section 12.10, but, in each case, no such transfer or assignment will relieve the Buyer of its obligations hereunder.

Section 12.05. *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state, except to the extent that the laws of such state are superceded by the Bankruptcy Code.

Section 12.06. *Retention of Bankruptcy Court Jurisdiction.* The parties hereto agree that, without limiting the right of any party to appeal any Order issued by the Bankruptcy Court or any other court, any suit, action or proceeding seeking to enforce or construe any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding that is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

Section 12.07. *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.08. *Counterparts.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

Section 12.09.  *Entire Agreement; Third Party Beneficiaries*.  This Agreement, including the exhibits and schedules, and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.  No provision of this Agreement is intended to confer upon any person other than the parties hereto and the Estate Representative any rights or remedies hereunder.

Section 12.10.  *Buyer Elections*.  Buyer may elect to (i) transfer or assign to one or more of its direct or indirect wholly-owned subsidiaries the right to purchase directly all or a portion of the shares of the foreign Subsidiaries, (ii) require the Company to cause any or all intercompany obligations of the Company and/or its Subsidiaries to be eliminated prior to the Closing Date, and/or (iii) make an election under section 338 of the Code; provided, in each case, that Buyer shall be responsible for any costs, expenses or liabilities (including without limitation Taxes) incurred by either party in connection therewith.

[Signatures Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Purchase Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Kasper A.S.L., Ltd.

By: _____
    Name:  John D. Idol
    Title:  Chairman & CEO

Jones Apparel Group, Inc.

By: _____
    Name:  Wesley R. Card
    Title:  Chief Operating and Financial Officer

<u>Exhibit A</u>

Form of Stipulation of Settlement of IRS Claim

(see attached)

<u>Exhibit B</u>

Capital Budget

(see attached)